[No. B017422. Second Dist., Div. Two. June 6, 1986.]

ELYSIAN HEIGHTS RESIDENTS ASSOCIATION, INC., et al.,
Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents;
MORTON PARK ASSOCIATES, Real Party in Interest and Respondent.

## COUNSEL

Lawrence Teeter, Barbara S. Blinderman and Jeffrey S. Cohen for Plaintiffs and Appellants.

Henry W. McGee, Jr., as Amicus Curiae on behalf of Plaintiffs and Appellants.

James K. Hahn, City Attorney, Gary R. Netzer, Sr., Claudia McGee Henry, and Anthony Saul Alperin, Assistant City Attorneys, and Michael S. Woodward, Deputy City Attorney, for Defendants and Respondents.

Ervin, Cohen & Jessup, Allan B. Cooper and Debra L. James for Real Party in Interest and Respondent.

OPINION

**COMPTON, Acting P. J.**—Elysian Heights Residents Association, Inc., et al., hereinafter appellants, appeal from a judgment of the superior court denying their petition for administrative mandamus. (See Code Civ. Proc., § 1094.5.) By way of this petition, appellants sought the revocation of a building permit issued by respondents City of Los Angeles et al. (City) to Morton Park Associates (Morton) for the construction of a three-story, forty-five unit apartment complex. Pursuant to appellants' request, and in order to preserve the status quo, we stayed further development of the project pending the outcome of this appeal. We now affirm the judgment and vacate the stay order.

The essential facts are not in dispute and may be summarized as follows. The subject property, located on Morton Avenue in the Elysian Park area of Los Angeles, consists of 5 lots approximately 250 feet in length and 150 feet in width. Morton first became interested in purchasing the parcel for development in March 1984, after reviewing the applicable zoning ordinances and finding that an apartment building with a maximum of 46 units could be constructed on the property. With its investigation completed, and apparently unaware of any specific challenges to, or plans to change, the existing zoning, Morton agreed to purchase the land for $450,000. Following the opening of escrow in April 1984, Morton prepared and submitted architectural and soil plans for the project to the department of building and safety; applied for grading, demolition, and building permits; and obtained approval of purchase money and construction loans in an amount exceeding $1.8 million.

Several months later, in August 1984, escrow closed and Morton was issued grading and demolition permits for the project. After receiving its building permit the following October, the developer demolished three existing structures on the property, commenced clearing and grading operations, excavated and recompacted the soil in accordance with the plans submitted to building and safety, and poured over 140 cubic yards of concrete footings for the foundation. While proceeding with this work, Morton also entered into various contracts with construction contractors and subcontractors for labor and materials needed for the project.[1]

In late October 1984, appellants, who were aware of the project and had been monitoring its progress through their city council representative for

---

[1]The value of these contracts represented approximately one-half of the total construction costs. Pursuant to the terms of the agreements, Morton also became liable for all penalties or losses incurred by the subcontractors, and for damages sustained by either the contractors or subcontractors resulting from any breach by the developer.

several months, first attempted to halt construction by appealing the issuance of the building permit to the board of zoning administrators on the ground that the size of the proposed apartment complex exceeded the density limits specified in the City's general plan for the Silver Lake-Echo Park area.[2] The applicable provisions of that plan classified the project site as "low-medium one residential," allowing for seven to twelve dwelling units per gross acre.[3]

In December 1984, while the administrative appeal was still pending, the department of building and safety, pursuant to the terms of an ordinance imposing a moratorium on all projects which exceeded the zoning and height requirements of the district plan, ordered Morton to immediately cease all construction work. At approximately the same time various homeowner associations filed an action in superior court, entitled Federation of Hillside Canyon Associations, Inc. et al. v. City of Los Angeles (L.A. Super. Ct. No. 526,616), to prevent the City from issuing building permits for development of property inconsistent with the general plan. Before this matter could be heard, however, the zoning administrator ruled on appellants' appeal, finding that building and safety did not err or abuse its discretion in issuing Morton's building permit.[4] This decision was immediately challenged by an appeal to the City's board of zoning appeals. In the interim, the board of building and safety commissioners conducted a hearing to determine whether Morton had a vested right to continue its construction pursuant to the terms of the City's moratorium ordinance. Although the commissioners eventually found that vested rights had accrued, a finding

[2]The City's general plan consists of 35 community or district plans, each for a separate geographic area, which set forth objectives, policies, programs, and planned development for the next 20 years. The most recent Silver Lake-Echo Park district plan, approved by the city council in February 1984, states in pertinent part: "This Plan proposes approximate locations and dimensions for land use. The Plan is *not* an official zone map and while it is a guide it does *not* imply any right to a particular zone or to the land use permitted therein. . . . Inasmuch as the Plan shows land use projected as much as 20 years into the future, it designates conditionally more land in some areas for different land uses than may be desirable for many years. [¶] The Plan is subject to periodic review and amendment to reflect changes in circumstances." (Italics added.)

[3]Based on the size and location of the subject property, the district plan would permit Morton to construct a 12-unit apartment building.

[4]In arguing their appeal, appellants relied on Government Code section 65860, which requires, inter alia, the City to make its zoning ordinances consistent with the general plan by July 1, 1982. By the time this deadline passed, the zoning on approximately 200,000 parcels of land, scattered throughout the city limits, remained inconsistent with the land uses detailed in the plan. Similar to the position advanced by the petitioners in the Federation of Hillside Canyon Associations case, *supra,* appellants maintained that because the City had failed to comply with section 65860, it was precluded from issuing Morton's building permit, and therefore the permit itself was invalid when issued. The zoning administrator flatly rejected these arguments.

required by the moratorium ordinance before construction would be allowed to continue, they stayed their decision pending the outcome of the appeal to the board of zoning appeals.

In January 1985, the superior court, in ruling on the Federation of Hillside Canyon Associations case, *supra,* issued a writ of mandate requiring the City to bring its zoning ordinances into conformity with the general plan, but denied the petitioners' request for an injunction against the issuance of building permits for inconsistent development. As a result, in April 1985, the City enacted the interim permit consistency ordinance which generally prohibited the department of building and safety from issuing permits which deviated from the requirements of the plan. Section 4C of the ordinance *exempted* those projects: "(1) For which architectural and structural plans sufficient for a complete plan check for a permit for such development were accepted by the Department of Building and Safety and for which a plan check fee was collected on or before the effective date of the ordinance [April 3, 1985], and (2) For which no subsequent changes are made to those plans which change the height, floor area, occupant load, number of dwelling units or number of guest rooms."

On April 16, 1985, the zoning administrator's ruling on the legality of Morton's building permit became final when the board of zoning appeals failed to act on the appeal. The following day appellants filed their petition for administrative mandamus and injunctive relief in the trial court. In denying the relief requested, the court, without specifically referring to the City's consistency ordinance, determined that because of respondents' conduct in granting the permit and the expenditures made by Morton prior to the commencement of this litigation, it would not be equitable to terminate the project.[5] This appeal follows.

██ We first consider appellants' contention that the disputed building permit was issued in violation of state statute and was thus void *ab initio* and must be revoked. The major thrust of appellants' argument in this regard

_____

[5]The trial court's minute order reads as follows: "The petition for writ of mandate is denied. [¶] The court determines that given the conduct of respondent city in issuing the permits and the expenditures made in anticipation of such issuance and, thereafter, and prior to the date of commencing this proceeding, it would not be equitable toward real party in interest [Morton] to require the project to be terminated. The court declines to rule that the lack of conformity between the project and the applicable community plan renders the permit void. The record . . . supports Morton's claim that it had spent substantial sums of money prior to this litigation and indeed prior to the moratorium. The harm to the petitioners [appellants herein] from the existence of the structure is of a more intangible sort. In addition, it is entirely possible that amendments to the community plan may, in the future, bring the project into line with the plan."

is that building permits, to be validly issued, must be consistent with a municipality's general plan. It is, therefore, necessary to determine whether Government Code section 65860 mandates such conformity.

(2)   We begin our analysis with the fundamental rule that a court, in interpreting a statute, should ascertain the intent of the Legislature so as to effectuate the purpose of the law. "In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.] We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.] 'If possible, significance should be given to every word, phrase, sentence and.part of an act in pursuance of the legislative purpose.' [Citation.] '[A] construction making some words surplusage is to be avoided.' [Citation.] 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]" (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230-231 [110 Cal.Rptr. 144, 514 P.2d 1224].)

█   Applying the foregoing principles to the case at bench, we first note that in recent years the Legislature has enacted a number of statutes as part of the State Planning and Zoning Law (Gov. Code, § 65000 et seq.), the combined effect of which is to require that cities and counties adopt a general plan for the future development, configuration, and character of a city and county and require that future land use decisions be made in harmony with that general plan. (*City of Los Angeles* v. *State of California* (1982) 138 Cal.App.3d 526, 530 [187 Cal.Rptr. 893]; *Bownds* v. *City of Glendale* (1981) 113 Cal.App.3d 875, 880 [170 Cal.Rptr. 344].) These requirements, forming what is generally referred to as the consistency doctrine, promote a particular nexus between land-use plans and government regulation of land use, such as zoning and subdivision map approval.

The doctrine has its roots in the language of the Standard Zoning Enabling Act (U.S. Dept. of Commerce, The Standard State Zoning Enabling Act, 1922 [rev. ed., 1926.]), which provides that zoning shall be done "in accordance with" a comprehensive plan. (See DiMento, *Improving Development Control through Planning: The Consistency Doctrine* (1978) 5 Colum. J. Envtl. L. 1.) Under this historical antecedent of the consistency doctrine, violations of the "in accordance with" language were found when (1) only selected areas within a municipality were regulated by zoning; (2) zoning was done by means of an interim ordinance that was enacted by legally questionable government practices; or (3) the zoning ordinance failed

to control one or more of the factors it was intended to regulate. (See DiMento, *Developing the Consistency Doctrine: The Contribution of the California Courts* (1980) 20 Santa Clara L.Rev. 285, 286.)

California's state planning laws took what some may consider a giant step forward when the Legislature, in 1973, mandated that zoning changes and subdivision approvals be consistent with the local general plan, and that the plan itself be internally consistent. (Lefcoe, *California's Land Planning Requirements: The Case for Deregulation* (1981) 54 So. Cal.L.Rev. 447, 488.) Although the Planning and Zoning Law establishes the authority of most local government entities to regulate the use of land (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 518-519, fn. 18 [113 Cal.Rptr. 836, 522 P.2d 12]), it commands municipalities to adopt "a comprehensive, long-term general plan for the physical development of the county or city . . . ." (Gov. Code, § 65300.) The plan itself must include, inter alia, a statement of policies, and nine specified elements: land use, circulation, housing, conservation, open-space, seismic safety, noise, scenic highway, and safety. (Gov. Code, § 65302.) Section 65566 requires that acquisition, regulation, and any other actions of the local government related to open space conform to the local open-space plan. Under section 65567, building permits, subdivision maps, and zoning ordinances affecting *open space* must be consistent with the *open space* plan. Section 65803 exempts charter cities from the consistency statutes unless they adopt these requirements or fall within the provisions of section 65860. And, sections 66473 and 66474 set forth various requirements for attaining subdivision consistency with general and specific plans.

Most relevant here, of course, is section 65860, which generally requires that county or city zoning ordinances be consistent with the general plan of the county or city, and allows private citizens to bring suit to enforce consistency of zoning with the general plan. Subdivision (d) specifically makes the statute applicable to Los Angeles and establishes a time table for bringing the City's zoning ordinances into conformity with the general plan.[6]

As can be seen, neither the language of section 65860 nor the statutory scheme in general mandates that building permits be scrutinized for plan

---

[6]Government Code section 65860, subdivision (d) provides: "Notwithstanding Section 65803, this section shall apply in a charter city of 2,000,000 or more population to a zoning ordinance adopted prior to January 1, 1979, which zoning ordinance shall be consistent with the general plan of such city by July 1, 1982." This subdivision has been amended by the Legislature in 1979 to allow the City additional time to bring its zoning ordinances into conformity with the general plan. Before this change in the statutory language a previous amendment had required the City to establish consistency by January 1, 1981.

consistency. Indeed, had the Legislature intended to fashion such a requirement, it clearly had the power to do so. In this regard, the State Planning and Zoning Law specifically prohibits the adoption or issuance of permits, subdivision maps, or zoning ordinances that are inconsistent with *open space* plans;[7] requires that tentative subdivision tract maps be drawn in conformity with the general plan (Gov. Code, § 66474.61, subd. (a)); and allows a court to enjoin issuance of all permits where a *general plan* is found to be inadequate. (Gov. Code, § 65755.) There is, however, nothing in the legislative history of section 65860 to suggest that the Legislature intended to prohibit the issuance of building permits for projects consistent with the zoning of a particular community but not the general plan. Moreover, there is no mention of any remedies available to halt construction of projects which are not in conformity with the general plan, and no sanctions are provided for noncompliance with section 65860, subdivision (d).

█ Generally, the enumeration of acts or things as coming within the operation of a statute precludes the inclusion by implication of other acts or things not listed. (*Western Pioneer Insurance Co.* v. *Estate of Taira* (1982) 136 Cal.App.3d 174, 181 [185 Cal.Rptr. 887].) █ Applying this rule to the instant case, we think it clear that the Legislature has purposefully failed to prohibit the issuance of building permits while the consistency process is being implemented. In the absence of any such provision it would ill-behoove any court to indirectly mandate the withholding of permits that are not in conformity with a municipality's general plan. If the Legislature desires such consistency, it should specifically say so.

Recognizing that amending zoning ordinances to make them consistent with a general plan would take time, the Legislature added subdivision (c) to section 65860 which states: "In the event that a zoning ordinance becomes inconsistent with a general plan by reason of amendment to such plan, or to any element of such plan, such zoning ordinance *shall be amended within a reasonable time* so that it is consistent with the general plan as amended." (Italics added.) The trial court had before it evidence that in 1982 the City had approximately 200,000 lots which had zoning inconsistent with the applicable general plan. If appellants' contentions were correct, no new building permits could be issued until all inconsistently zoned lots were made to conform to the provisions of the general plan. This would bring new construction in the City to a grinding halt and cause economic havoc.

---

[7]Government Code section 65567 reads as follows: "No building permit may be issued, no subdivision map approved, and no open-space zoning ordinance adopted, unless the proposed construction, subdivision or ordinance is consistent with the local *open-space* plan." (Italics added.) This provision is not applicable to Los Angeles, a charter city. (See Gov. Code, §§ 65700 and 65803.)

As one commentator has aptly observed, "Halting construction for the years it takes to adopt a general plan [or amend zoning ordinances] works great hardship. During those years of delay, some projects that were once economically feasible will become impracticable. Even those projects that survive the de facto moratorium will be costly to consumers if developers are able to recoup their increased land holding, construction, and borrowing costs through higher prices. For buyers priced out of the market by these delays, the loss may be irretrievable; anyone who doubts it should talk to a renter who could have afforded a house some years ago, but who had been left behind by rising prices. Neither the courts nor the Legislature seem to have understood who really pays the price when zone changes, building permits, and subdivision approvals are withheld pending the adoption of a general plan." (Lefcoe, *California's Land Planning Requirements: The Case for Deregulation, supra,* 54 So. Cal.L.Rev. 447, 489.)

The decision of the Court of Appeal in *Hawkins* v. *County of Marin* (1976) 54 Cal.App.3d 586 [126 Cal.Rptr. 754] supports the conclusions reached here. In that case, a religious, social service group sponsored a plan for constructing federally subsidized multiunit housing for the elderly on land owned by an affiliate of the Roman Catholic Church in an area zoned for single-family residences. After an unsuccessful first attempt, the group secured a conditional use permit. Two years after the permit was issued, landowner neighbors of the proposed development brought suit against the county, contending that the project was impermissible under the property's zoning and, if not, then the county's zoning regulations were inconsistent with its general plan. The thrust of the argument was that conditional use permits, as well as zoning ordinances, must be consistent with county general plans.

The court readily disposed of the consistency argument by reference to section 65860 and related statutes. "Since use permits issued pursuant to [the] Marin County Code . . . must necessarily conform to its requirements, it follows that if the code section is kept consistent with the general plan, use permits issued thereunder will also be consistent therewith. There is no requirement, however, that such permits themselves be reviewed for consistency with the plan under section 65860. [¶] As noted, section 65860 applies to zoning ordinances. It says nothing about permits issued pursuant to such ordinances. That a conditional use permit is not an ordinance is obviously true. . . . Moreover, since statutes related in purpose to section 65860 expressly require plan consistency for subdivision maps [citation] and, . . . [open space] projects requiring a building permit [citation], the failure of section 65860 to create a parallel requirement for conditional use permits is significant. We conclude that, in this case, section 65860 is

inapplicable to the use permit issued by the County of Marin." (*Hawkins v. County of Marin, supra,* 54 Cal.App.3d 586, 594-595.)

Appellants' reliance on *Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176 [203 Cal.Rptr. 401], is totally misplaced. There, a citizens' group sued Calaveras County and a construction company challenging the issuance of a conditional-use permit for the processing of hydraulic mine tailings in the production of sand and gravel. The complaint alleged the permit was invalid because the noise and safety element of the county's general plan did not comply with state statutes. The court held that the use permit was ultra vires if the county's general plan lacked elements required by state law relevant to the use sought. (*Id.,* at p. 1184.)

These facts are inapposite to the case at bench. Appellants have not nor cannot allege that the City's general plan is in violation of state statute. Rather, appellants want the building permits declared void because the zoning was, and apparently remains inconsistent with the Silver Lake-Echo Park district plan. What appellants fail to grasp, however, is that Morton obtained its building permit consistent with then existing zoning laws. Given the basis for the court's decision in *Neighborhood Action, supra,* the case provides no support for appellants' contention that section 65860 requires consistency review of building permits.

■ We also think it clear that Morton's permit was issued in complete compliance with the City's land use regulations. At the time of issuance nothing in the Los Angeles Municipal Code (LAMC) required consistency between building permits and the general plan. LAMC section 12.21(a)(1)(a) merely mandated conformity between permits and the applicable zoning ordinances.[8] As previously noted, Morton's plan to construct a 45-unit apartment complex was in complete accord with then existing zoning laws. Once an applicant has complied with the appropriate land use regulations, the department of building and safety has *no* discretion to deny issuance of a permit. (LAMC § 81.0203.)

■ The City's interim ordinance, which does require permit/plan consistency, was given only prospective application and thus did not affect the validity of Morton's permit. After balancing competing interests, the city council properly determined that projects which had been approved prior to the ordinance's effective date, and did not vary from their originally

---

[8]LAMC section 12.21(a)(1)(a) provides in pertinent part: "No building or structure shall be erected, . . . nor shall any building structure or land be used or designed to be used for any use other than is permitted in the zone in which such building, structure or land is located. . . ."

approved plans, were entitled to go forward. As found by the trial court in the Federation of Hillside Canyon Associations case, *supra,* the enactment of the interim ordinance represented a good faith effort by the City to bring its regulations into substantial compliance with state law. ■ Zoning ordinances are, of course, presumed to be a valid exercise of the police power with every intendment in favor of their validity. "The wisdom of the prohibitions and restrictions is a matter for legislative determination, and even though a court may not agree with that determination it will not substitute its judgment for that of the zoning authorities if there is any reasonable justification for their action." (*Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461 [202 P.2d 38, 7 A.L.R.2d 990].) ■ We agree with respondents that for this court to now say that the issuance of Morton's building permit constituted an abuse of discretion would seriously undermine the city council's authority to enact land use regulations and invite a further, unending spiral of litigation. It must be remembered that the plan which appellants view as sacrosanct was itself a creature of the City and presumptively can be changed by the City.

Having concluded that the State Planning and Zoning Law does not preclude issuance of permits which may be inconsistent with a community's general plan, and that Morton's building permit was issued in compliance with city ordinances, we need not discuss appellants' remaining contentions.

The judgment is affirmed and the stay order is vacated.

Beach, J., concurred.

**GATES, J.**—I respectfully dissent.

Initially I confess my inability to understand how the judiciary's utilization of one of its ordinary legal remedies to enforce a statutory mandate expressly drafted by the legislative branch could, in some fashion, constitute a violation of the separation of powers doctrine. It would seem rare indeed for our lawmakers to add to their prescribed commands, separate admonishments directing the courts of this state to fulfill their constitutional duty to see that those enactments are honored.

My colleagues hold that if our Legislature desires consistency between a building permit for proposed new construction and that portion of a general plan covering the geographic area in which the construction is to occur, it should specifically say so. (Maj. opn. p. 29.) However, Government Code section 65860 already includes the express commandment: "(a) County or city zoning ordinances shall be consistent with the general plan of the county

or city by January 1, 1974."[1] It is difficult for me to imagine why our lawmakers would have insisted upon such consistency if they had not intended it to impact upon all developments undertaken after the dates designated.

Subdivision (c) of section 65860 provides: "In the event that a zoning ordinance becomes inconsistent with a general plan by reason of amendment to such a plan, or to any element of such a plan, such zoning ordinance shall be amended within a reasonable time so that it is consistent with the general plan as amended."

My colleagues emphasize the words "shall be amended within a reasonable time." (Maj. opn. p. 29.) I would stress instead those words which reveal that this subdivision treats only with an instance where "a zoning ordinance *becomes inconsistent* with a general plan *by reason of amendment to such a plan,* or to any element of such a plan . . . ."

So far as is applicable to these proceedings there has been no *amendment* of the Los Angeles General Plan. The city simply has declined for eight long years to follow the law as enacted in 1978, a law which explicitly required it to bring its zoning into compliance with its general plan in the first instance. (Stats. 1978, ch. 357, § 1.)

Similarly, subdivision (b) of section 65860 announces: "Any resident or property owner within a city or a county, as the case may be, may bring an action in the superior court to enforce compliance with the provisions of subdivision (a)," which, as quoted *ante,* mandates conformity. The only time limit placed on instituting even such an action as this is that it should be brought "within 90 days of the enactment of any *new* zoning ordinance or *the amendment* of any existing zoning ordinance . . . ." (Italics added.) Los Angeles' nonconforming zoning ordinances are neither *new* nor *amended.*

In any event, we are not here concerned with a suit that seeks to conform zoning to a general plan. Therefore, in my view, the fundamental question that engages us should not be resolved by focusing upon the fact that even when zoning is inconsistent, it is mechanically possible to obtain a document captioned: "Building Permit." What we must decide is whether or not our legislators intended concrete and steel buildings to continue to be erected in locales wherein it had long been determined they had no place. For my

---

[1]July 1, 1982, in the case of the City of Los Angeles. (Gov. Code, § 65860, subd. (d).)

part, I believe our lawmakers were not striving for paper consistency, but compatibility among living people, their structures and their neighborhoods.

I also fail to see how a city that has for years deliberately failed to conform its zoning to its general plan, may now "grandfather in" future illegal construction by the enactment of an "Interim Ordinance." I agree, of course, that challenged zoning ordinances are ordinarily "presumed to be a valid exercise of the police power with every intendment in favor of their validity." (Maj. opn. p. 32.) However, the zoning ordinance here in issue was, and has been for many years, concededly contrary to the law. The Los Angeles City Council's "Interim Ordinance" does not attempt to declare otherwise; it merely purports unilaterally to extend the period in which that illegality may be ignored.

Lastly, I do not perceive how the "equities" of this situation can redound to the benefit of this developer. I sincerely hope I shall never be guilty of minimizing or demeaning the great social contributions bold entrepreneurs make under our free enterprise system. Nevertheless, most profit-making ventures, almost by definition, entail some element of risk. Here, Morton Park Associates (Morton), as did many, many others in Los Angeles, hastened to obtain a building permit for a structure which it knew would not comply with the provisions of Los Angeles' general plan. Opportunity for such a calculated gamble remained open solely because of the city's turtling efforts to correct its long invalid zoning.

Consequently, when weighing equities, it is pointless to compare Morton's position and conduct with the city's, for both share the same ground. This fact is made manifest not only by the words set forth in their respective briefs, but also by their deeds. However, if Morton's entitlement is compared to that of the hundreds of residents in the affected area, only some of whom are directly represented by appellants, a much different picture appears.

In this particular, though recognizing the fault may be my own, I concede my inability to comprehend how, before even one foundational brick is laid, a developer can acquire the right to mar forever a residential neighborhood with winding narrow streets by constructing therein a massive building it knew in advance would constitute a permanent nonconforming use immediately upon completion.

There are many today who, with good reason, express consternation and regret at our citizenry's increasing resort to the initiative process to protect those public interests they believe their representatives have failed to guard.

If these critics should seek to understand the causes of this phenomenon, they might well review the history of this case.

Despite my foregoing hastily drafted, and perhaps too colorful, observations, I recognize that to date I stand alone. If my views are not ultimately to prevail, I certainly have no desire to cause Morton further needless expense by delaying the filing of this decision. Therefore, I shall not attempt to compose a detailed analysis of my colleagues' opinion, but shall lapse into silence, ending this dissent by attaching as an appendix, appellant's reply brief, a document whose contents I find convincing. In turn, I trust that Morton will not seek to aggravate its potential damages by any action taken during the pendency of a petition for review, should one be filed. This is, unfortunately, one of the few areas in life or in law where self-inflicted wounds are sometimes deemed advantageous.

A petition for a rehearing was denied July 2, 1986. Gates, J., was of the opinion that the petition should be granted. Appellants' petition for review by the Supreme Court was denied July 31, 1986.

## APPENDIX

BUILDING PERMIT IS VOID IF THE ZONING UPON WHICH IT IS BASED IS INCONSISTENT WITH THE GENERAL PLAN.

In this case, neither Real Party nor Respondents contest Appellants' claim that the building permit at issue below was issued with reference to zoning that is inconsistent with the general plan. Instead, they simply assert that such a building permit is valid upon issuance so long as it is consistent with the zoning in effect at the time, even if such zoning is inconsistent with the plan. It is not denied that the City of Los Angeles has been and remains under a statutory duty to establish conformity between existing zoning and the general plan and that zoning in effect at the site in question reflected a violation of this statutory duty by Respondents. (Government Code § 65860). In effect, Real Party and Respondents maintain that conformity between a building permit and existing zoning insulates the permit from attack even if the zoning in question, and hence the permit itself, conflict with the general plan and the Government Code's well settled statutory insistence upon consistency between plan and zoning.

In their opening brief, Appellants cited *Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176 [203 Cal.Rptr. 401], a case which Real Party and Respondents have attempted at considerable length to distinguish from the present controversy. An analysis of their arguments and this decision serves to vindicate Appellants' thesis that building permits which conflict with a general plan are void *ab initio*.

In *Neighborhood, supra,* the Court held "that the issuance of a conditional use permit is ultra vires if the general plan of the issuing entity (see Gov. Code, § 65300 et seq.) does

not conform to mandatory statutory criteria which are relevant to the uses sought by the permit." (*Id.*, p. 1179). Both Respondents and Real Party have argued that this holding does not apply to the present case, in which appellants seek to vindicate rather than challenge the general plan in question. (Respondents' Brief, hereinafter RB, 20, Real Party's Brief, hereinafter RPB, 26). Respondents also argue that *Neighborhood,* which involved a conditional use permit, is inapplicable to building permit cases, since the issuance of a building permit involves a ministerial act rather than an exercise of discretion available in conditional use permit cases. (RB, 20-21). As shall become clear from the following discussion, both of these attempts to attack the applicability of *Neighborhood* to this case are without substance.

In *Neighborhood, supra,* 156 Cal.App.3d 1176, the Court utilized the following language in articulating its conclusion that the general plan enjoys primacy in the hierarchy of land use controls: "The general plan is atop the hierarchy of local government law regulating land use. It has been aptly analogized to 'a constitution for all future developments.' (See *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774 [42 Cal.Rptr. 283].) The Legislature has endorsed this view in finding that 'decisions involving the future growth of the state, most of which are made and will continue to be made at the local level, should be guided by an effective planning process, including the local general plan, and should proceed within the framework of officially approved statewide goals and policies directed to land use, population growth and distribution, development, open space, resource preservation and utilization, air and water quality, and other related physical, social and economic development factors.' (Section 65030.1 [Gov. Code.].)

"Subordinate to the general plan are zoning laws, which regulate the geographic allocation and allowed uses of land. Zoning laws must conform to the adopted general plan. ([Gov. Code] § 65860; *Resource Defense Fund* v. *County of Santa Cruz* (1982) 133 Cal.App.3d 800 [184 Cal.Rptr. 371].) . . ." (*Neighborhood, supra,* at p. 1183). The court then proceeded to discuss the position occupied by permits in the hierarchy of land use controls, and made the following observation: "Although use permits are not explicitly made subject to a general plan meeting the requirements of state law, that condition is necessarily to be implied from the hierarchical relationship of the land use laws. To view them in order: a use permit is struck from the mold of the zoning law (§ 65901); the zoning law must comply with the adopted general plan (section 65860); the adopted general plan must conform with state law. (§§ 65300, 65302). The validity of the permit process derives from compliance with this hierarchy of planning laws." (*Neighborhood, supra,* p. 1184).

In view of this hierarchy, the Court concluded as follows: "A permit action taken without compliance with the hierarchy of land use laws is ultra vires as to any defect implicated by the uses sought by the permit." (*Ibid.*)

It is clear from the foregoing language that an invalid zoning scheme cannot insulate a permit from attack. Land use controls stand in a hierarchical relationship to each other. Each level of this hierarchy presupposes for its validity its conformity with all more pervasive controls. If zoning that conflicts with a general plan could insulate a building permit from attack, then a general plan which violates state law could insulate from attack a conditional permit that contradicted statutory policies. *Neighborhood* rejected this view. It clearly defeats the arguments advanced by Real Party and Respondents in this case.

From the foregoing discussion, it is clear that attempts to distinguish *Neighborhood* from the present matter are doomed to failure. The fact that *Neighborhood* involved an invalid rather than a valid general plan is simply irrelevant as a point of material distinction. The whole point of *Neighborhood* is that permits which conflict with valid general plans are ultra vires. This is Appellants' position.

The *Neighborhood* decision is also important due to its discussion of *Hawkins* v. *County of Marin* (1976) 54 Cal.App.3d 586 [126 Cal.Rptr. 754], upon which both Real Party and Respondents attempt to rely in their briefs. This discussion is entirely ignored by both Real Party and Respondents. The reason is obvious. In *Neighborhood, supra,* 156 Cal.App.3d 1176, the Court observed: "The county and Teichert rely on *Hawkins, supra,* to support their claim that conditional use permits need not be consistent with the county general plan. The plaintiffs in *Hawkins* sought to invalidate a conditional use permit approved on March 6, 1972, by means of a complaint filed two years after the permit was granted. They invoked a provision in section 65860 which provided then, as now, that zoning ordinances must be

consistent with the adopted general plan commencing January 1, 1974. (See Stats. 1973, ch. 120, § 6, p. 184). *The use permit was approved (1972) prior to the effective date of the conformity requirement.* (See Stats. 1971, ch. 1446, § 12, p. 2858.) However, in dicta [footnote], the court said that 'section 65860 is inapplicable to a review of the [conditional use] permit' since it contains 'no requirement . . . that such permits themselves be reviewed for consistency with the [general] plan'; it reasoned that '[s]ince use permits issued pursuant to [the zoning ordinance] must necessarily conform to its requirements, it follows that *if* [the zoning ordinance] is kept consistent with the general plan, use permits issued thereunder will also be consistent therewith.' (*Id., 54* Cal.App.3d at pp. 594-595, italics added.)'' (*Id.,* at pp. 1185-1186, first italics added.) Thus, the entire passage cited by Respondents (RB 18-19) and Real Party (RPB 24-25) is nothing more than dicta, since the consistency requirement contained in Government Code section 65860 did not even apply to the zoning at issue in *Hawkins* at the time of the contested permit's issuance. See *Neighborhood Action Group,* 156 Cal.App.3d, p. 1186, fn. 7.

In their next paragraph, the *Neighborhood* opinion's authors then proceeded to articulate the following criticism of *Hawkins'* dicta: "The flaw in the argument is the conditional 'if'. *If* the general plan is not consistent with state law, the zoning ordinance may fail to provide criteria by which to measure the propriety of the uses sought by the permit. The *Hawkins* reasoning opens the door to defeat of the purpose of a general plan to provide enforceable standards by which the administering agency must measure the propriety of the permits. (Citation.)'' (*Neighborhood, supra,* at p. 1186.) By parity of reasoning, if the zoning ordinance is not consistent with the general plan, it would likewise "fail to provide criteria by which to measure the propriety of the uses sought by the permit.'' Plainly, the rationale of *Neighborhood* serves to undermine not only *Hawkins'* dicta but also the contention of Respondents and Real Party that lack of conformity between zoning and the general plan does not vitiate building permits based upon the zoning ordinance in question.

A contrary conclusion would strip the general plan of its status as "a constitution for all future developments.'' (*O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774 [42 Cal.Rptr. 283].) If building permits issued by reference to zoning that was not consistent with a general plan were valid, then the zoning ordinance, rather than the general plan, would be determinative, and the plan would be reduced to the status of an advisory document. Of course, the plan is far more than advisory, for zoning ordinances must conform with general plans under the Government Code. It follows from this discussion and *Neighborhood's* rationale that building permits which are inconsistent with general plans are void ab initio.

This analysis disposes of the contention advanced by Respondent and Real Party that the legislature's failure to address the impact of permit-plan consistency evidences its intent to adopt the view that permits need only be consistent with zoning ordinances. For this contention, which appears in *Hawkins'* dicta, was explicitly rejected by *Neighborhood, supra,* 156 Cal.App.3d 1176. It is not difficult to comprehend the reasons for this rejection. If the Legislature had wished to establish the proposition that building permits are valid so long as they are consistent with zoning ordinances and regardless of whether they are consistent with general plans, it would have simply declined to require conformity between zoning and general plans. Instead, the Legislature chose the opposite course. (Gov. Code § 65860). But the requirement of plan-zoning consistency entails a requirement of plan-permit consistency, since permit applications are evaluated with reference to zoning.

Respondents, as has already been mentioned, attempt to distinguish *Neighborhood, supra,* from the present case by pointing out that while the issuance of building permits involves ministerial acts, the issuance of conditional use permits involves exercises of discretion. (RB 20). The City quotes a passage from *Neighborhood* which contains general language explaining the difference between discretionary and non-discretionary permits. Yet nowhere in this passage or at any other point in the *Neighborhood* opinion (p. 1183) does language appear which serves to suggest that *Neighborhood's* holding only applies to conditional use permits rather than to building permits. Indeed, it is difficult to imagine a rationale supporting Respondents' proposed distinction. Both conditional use permits and building permits must be evaluated with reference to zoning ordinances, which, in turn, must be consistent with general plans. The suggestion that only conditional use permits as opposed to building permits must be consistent with general plans offends common logic.

This last observation itself disposes of Real Party's theory that because the municipal code requires the City to issue building permits which are consistent with zoning ordinances, the City has no authority to withhold issuance of such permits merely because they collide with the general plan and that for this reason, permits which are inconsistent with the general plan are not void. (RPB, 26-27.) This argument begs the question however, for it rests upon an assumption that the City has the authority to enact and implement a municipal code section which contradicts state law. This question shall be discussed at greater length below. Suffice it so say for present purposes that if the Government Code requirement of plan-zoning consistency means, as is indicated by *Neighborhood, supra,* that permits which are inconsistent with general plans are void, the City is in no position to argue that its local ordinances require issuance of permits which are justified only by non-plan-consistent zoning, since such an argument presupposes the City's authority to override statutory law enacted by this State's legislature. The City cannot, in other words, hide behind the ministerial character of the acts involved in building permit approvals, for the City cannot validate permits that are void under state law. A contrary conclusion would permit a city to subvert Government Code section 65860 by the simple device of enacting an ordinance "requiring" City agencies to issue building permits that are appropriate under established zoning even if such zoning ordinances violate state law by remaining inconsistent with general plans.

Real Party argues that the Legislature has created only one remedy designed to rectify problems created by plan-zoning inconsistency, namely, an action to compel establishment of plan-consistent zoning patterns. (RPB, 28.) It is then argued that this remedy was intended to be exclusive and that Petitioners' failure to have pursued an action predicated upon Government Code section 65860, subdivision (b) is fatal to their case, which is based upon a challenge to a building permit rather than to the zoning in reliance upon which it was issued. This argument, however, is foreclosed by the *Neighborhood* decision, which involved an action challenging a permit's legality. Furthermore, Real Party's argument makes no practical sense. The legislature cannot possibly have intended to force plaintiffs in Appellants' position to bring an action for establishment of plan-conformant zoning before seeking to challenge specific building permits given the danger that completion of all permit-authorized construction might well precede completion of litigation designed to compel enactment of appropriate zoning ordinances. Real Party's theory would serve to deprive aggrieved parties of any possible avenue through which to judicially challenge specific developments prior to their completion.

Nor can the Legislature's failure to specifically articulate the availability of a remedy be interpreted as an indication of a legislative intention to render such a remedy non-existent. In *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514], the Court stated: "That Government Code section 65302 does not provide for injunctive relief where a proposed public works project is not consistent with a general plan does not deprive the trial court of authority to employ this remedy." (*Id.,* at pp. 998-999.) Clearly, similar reasoning is applicable to building permits which conflict with general plans. If a public works project which conflicts with a general plan may be enjoined even absent specific statutory authorization for such a remedy, then a building permit which conflicts with a general plan is likewise subject to judicial attack.

Appellants' argument concerning the void status of building permits that are inconsistent with general plans finds additional support from the holding in *deBottari* v. *City Council* (1985) 171 Cal.App.3d 1204 [217 Cal.Rptr. 790], in which it was established that enactments creating zoning patterns which are inconsistent with general plans are void ab initio. In *deBottari, supra,* the City council amended its general plan to permit certain developments and then brought existing zoning into conformity with the amended plan. Voters then attempted to obtain certification of a ballot measure which would have re-zoned the affected land, and the city refused to place this measure on its ballot. This action was upheld by the Court of Appeal, which reasoned that enactment of a zoning ordinance inconsistent with the general plan would violate the policies underlying this State's consistency statute, Government Code section 65860. The Court specifically held, "A zoning ordinance inconsistent with the general plan at the time of its enactment is 'invalid when passed.' (*Sierra Club* v. *Board of Supervisors,* (1981) 126 Cal.App.3d 698, 704. . . ." (*deBottari, supra,*

at p. 1212.) The Court quoted with approval a law review observation that "[t]he focus of the legislative scheme in California's modern statutes . . . seems to be the requirement that the exercise of the police power in the zoning and *land-use permit* area be consistent with the general plan." (*Id.*, at p. 1211; italics added.) Plainly, if enactment of a zoning ordinance which is inconsistent with a general plan is void ab initio, the same is true with respect to issuance of a building permit which conflicts with the general plan, since building permits are issued with reference to zoning ordinances. *deBottari* is consistent with the *Neighborhood* analysis detailed above.

Another decision illustrating Appellants' thesis as validated by *Neighborhood,* is *Buena Vista Gardens Apartments Association* v. *City of San Diego Planning Department* (1985) 175 Cal.App.3d 289 [220 Cal.Rptr. 732], in which the Court of Appeal issued a writ ordering the trial court to refuse approval of a planned residential development permit until the City had corrected a material defect in the housing element of its general plan. *Buena Vista* illustrates the proposition that *permits* must conform to general plans. This is, of course, the entire point of this discussion.

Real Party has cited the case of *San Franciscans for Reasonable Growth* v. *The City and County of San Francisco* (1984) 151 Cal.App.3d 61 [198 Cal.Rptr. 634] as standing for the proposition that permits should not be declared invalid if such a declaration could impose hardship upon developers. (RPB, 29-30). This argument, however, has nothing to do with the question of whether permits which are inconsistent with general plans are void. Rather, such an argument only relates to the question of whether a declaration of invalidity is inequitable in the event that developers have substantially and in good faith relied upon the issuance of defective permits. The so-called vested rights and equity questions will be addressed separately in this brief. For present purposes, it need only be noted that such issues are analytically distinct from the question of whether permits issued in reliance upon zoning ordinances that are illegally at variance with general plans are void. Nothing in *San Franciscans, supra,* suggests that a negative answer to this question is appropriate, for the issue was not even addressed in that case.

Respondents and Real Party all argue that the permit at issue in this case is validated by Los Angeles Municipal Ordinance No. 159748, which purports to retroactively validate building permits issued prior to the City's enactment of a moratorium on plan-variant permits. As has been pointed out by Respondents and Real Party, this ordinance was an outgrowth of the Federation of Hillside Canyon Associations v. City of Los Angeles (L.A. Sup. Ct. 526,616) litigation, which challenged the City's failure to establish conformity between existing zoning and the general plan as required by Government Code section 65860. The litigants in Federation, *supra,* stipulated to the entry of a judgment on June 14, 1985, in accordance with which the City would be required to "keep in place" (RB 3) the above-specified ordinance, known as the Interim Permit Consistency Ordinance, hereinafter described as the Consistency Ordinance, effective on April 3, 1985. (RB 3.) This Consistency Ordinance precludes the issuance of building permits that are inconsistent with this City's general plan but purports to exempt all permits for which "a plan check fee was collected on or before the effective date of the ordinance[,]", namely April 3, 1985. (See RPB, 18.)

There are several defects inherent in the reasoning of Respondents and Real Party.

Firstly, Appellants herein were not parties to the Federation of Hillside Canyon Associations litigation and are therefore not bound by the stipulation which brought it to a conclusion. Therefore, Appellants have never consented to the Consistency Ordinance as an adequate answer to their attack upon the legality of Real Party's building permit.

Secondly, there is nothing which would prevent the City from amending this ordinance at some future date in such a way as to eliminate its retroactive permit validations clause. In the event of such an amendment, aggrieved developers would be left to argue that they had acquired vested rights to proceed with construction through good faith reliance upon their respective permits. (*Avco Community Developers* v. *South Coast Regional Commission* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546]). As has already been mentioned, the vested rights inquiry is separate from and logically follows any determination of permit invalidity. Consequently, any vested rights arguments advanced in the wake of such a possible repeal would not operate to validate permits.

Thirdly, the Ordinance's retroactive permit validation provisions may be read as simply an articulation of the vested rights doctrine rather than as an attempt to validate non-conformant permits. As shall be demonstrated below, this interpretation is necessary to save the Ordinance form attack on state pre-emption grounds. At the same time, such an interpretation may not suffice for this purpose. Since vested rights determinations are case-specific by definition, a class-based accrual of vested rights is equivalent to a legislative validation of invalid permits. The question is, therefore, whether the City has the power to enact an ordinance purporting to validate building permits that are illegal under State statute.

That this question commands a negative answer cannot be doubted at this juncture. After having failed to comply with the Government Code consistency statute (§ 65860), the City of Los Angeles sued the State in order to obtain a determination overturning its requirements. In rejecting this attack, Division Two of the Second District Court of Appeals made the following observation in *City of Los Angeles* v. *State of California* (1982) 138 Cal.App.3d 526 [187 Cal.Rptr. 893]: "Notwithstanding this [State's Constitutional] 'home rule' provision, the 'general law prevails over local enactments of a charter city, even in regard to matters which would otherwise be deemed strictly municipal affairs, where the subject of the general law is of statewide concern.' (*Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 292 . . . *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 136 . . . .

"The state's interest in requiring *all* counties and cities in California to adopt general plans seems clear-cut and is not challenged by respondent [City of Los Angeles]. . . . Yet, a failure to have a similar requirement for the implementation of these general plans by means such as zoning would once again almost certainly relegate each of them to the status of an ' "interesting study." ' (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 532 . . . . Such a result would subvert the 'combined effect' of the State Planning and Zoning Law 'which is to require that cities and counties adopt a general plan for the future development, configuration and character of the city or county and require that future land use decisions be made in harmony with that general plan.' (*Bounds* v. *City of Glendale,* . . . 113 Cal.App.3d 875, 880.)

" ' . . . There must always be doubt whether a matter which is of concern to both municipalities and the state is of sufficient statewide concern to justify a new legislative intrusion into an area traditionally regarded as "strictly a municipal affair." Such doubt, however, "must be resolved in favor of the legislative authority of the state." [Citation.]' (*Baggett* v. *Gates, supra,* 32 Cal.3d 128, 140.) We, therefore conclude that, at least in the absence of any evidence on the subject, the home rule doctrine is inapplicable in the instant case and the general law is paramount." (138 Cal.App.3d at pp. 532-533.) Thus, the policy requiring zone-plan (and hence permit-plan) consistency is a State policy, and a City does not have the authority to interfere with its vindication by recourse to the home rule doctrine. It remains only to point out that "[l]ocal legislation in conflict with general law is void." (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 484 [204 Cal.Rptr. 897, 683 P.2d 1150].) To the extent that the Consistency Ordinance purports to validate permits the issuance of which contravenes the plan-zone-permit consistency requirement flowing from Government Code section 65860, that ordinance is void under *City of Los Angeles* v. *State of California, supra,* 138 Cal.App.3d 526. Whether developers who have substantially relied upon this ordinance have thereby acquired vested rights to proceed with construction authorized by their invalid permits is, as has been demonstrated, a separate question that must be addressed on a case-by-case basis. Appellants simply observe that this ordinance cannot confer legitimacy upon permits [whose issuance] violated state law in the first place.

Faced with their defeat before this Court in *City of Los Angeles* v. *State of California, supra,* Respondents play fast and loose with this decision's text in their brief and reproduce an out-of-context quotation in an attempt to argue that this Court would favor the Consistency Ordinance. Respondents' excerpt ends with the following sentence: "In fact, an excellent case could be made for the proposition that the sheer geographical size of Los Angeles, and the myriad divergent land use problems resulting therefrom, should be cause for permitting it *greater, rather than less, flexibility* in the development and augmentation of long-range guildlines, than is afforded to others." (RB 13, quoting from *City of Los Angeles, supra,* at p. 535.) Respondents, however, conveniently ignore not only the previously quoted lan-

guage from *City of Los Angeles* but also the very next sentence in that opinion's text, which contains the following language: "Nonetheless, even if we had before us a record that revealed all the determinative facts, our duties would permit us to inquire only into the propriety, and not the sagacity, of our legislative colleagues' decisions. As we observed in *People* v. *Hill* (1982) 134 Cal.App.3d 1055, 1060 [185 Cal.Rptr. 64], 'Our belief in the concept of judicial restraint, and our deference to the powers granted our coequal government partners, cannot be limited to those instances where, after viewing the fruits of their labors, we find them good.' Here, we can but conclude that the challenged statute is not unconstitutional on its face." (*City of Los Angeles, supra,* 138 Cal.App.3d at p. 535). Plainly, therefore, this Court's decision in *City of Los Angeles* cannot possibly be read as an endorsement of the Consistency Ordinance, especially in light of its language concerning preemption.[1]

For the foregoing reasons, it is respectfully submitted that the instant building permit is void under Government Code section 65860, *Neighborhood, supra,* 156 Cal.App.3d 1176, *Buena Vista Gardens Apartments Assn., supra,* 175 Cal.App.3d 289, and *Friends of B Street, supra,* 106 Cal.App.3d 988. The *City of Los Angeles* decision rendered by this Court demonstrates that the Consistency Ordinance does not change this situation. The attempt to validate building permits which are inconsistent with general plans, if successful, "would once again almost certainly relegate each of [such plans] to the status of an '"interesting study."'" (*City of Los Angeles, supra,* p. 533).

Public policy requires a clear holding that the City of Los Angeles cannot legally issue building permits which are inconsistent with its general plan. The City has defied Government Code section 65860 for years, even after having lost its attempt have this section declared unconstitutional as applied to this City in the *City of Los Angeles* v. *State of California* litigation. There is nothing but an ordinance that the City could amend out of existence which serves to prevent Respondents' reversion to its time-tested habit of issuing building permits in defiance of state law. A clear message from this Court is urgently needed to remind Respondents that their attempts to subvert compliance with the laws of this State will not continue to be tolerated.

II

NEITHER THE VESTED RIGHTS DOCTRINE NOR THE BALANCE OF EQUITIES ENTITLES REAL PARTY TO PROCEED WITH ITS NON-CONFORMING PROJECT.

In its order denying the instant Petition for Writ of Mandate, the trial court concluded that the balance of equities favored Real Party as opposed to Petitioners after declining to determine that Real Party's building permit was void. The trial court never expressly determined that Real Party had acquired a vested right to proceed with construction in good faith reliance upon its building permit. Yet it is precisely such a finding that is essential to its judgment if the building permit if, as has already been demonstrated, invalid. Given the permit's invalidity, the trial court's failure to make factual and legal findings consistent with Real Party's acquisition of vested rights to proceed with construction constituted reversible error. A balancing of equities is no substitute for a vested rights determination.

In this section of the brief, it shall first be demonstrated that Real party acquired no vested rights to proceed with construction. Additional equitable considerations shall then be addressed in light of an assumption that the acquisition of vested rights can be taken as a given for discussion's sake.

A THE VESTED RIGHTS DOCTRINE:

There are certain conditions under which it is possible for a developer to proceed with

---

[1]Incidentally, Real Party has asserted in its brief that the present case represents possibly the only controversy regarding non-conforming permits in the wake of the *Federation* settlement. (RPB, 17.) Such speculation is not only beyond the record but is factually erroneous. This Court may take judicial notice of *Friends of Westwood, Inc.* v. *City of Los Angeles,* C 587900, and *Wilmington Homeowners Assn.* v. *City of Los Angeles,* C 50C 81192.

construction despite defects characterizing the permit authorizing such activity. Those circumstances must suffice to establish the existence of "vested rights." The factors governing their emergence are set forth in the Supreme Court's opinion in *AVCO Community Developers, Inc.* v. *South Coast Regional Commission* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546], which contains the following language: "It has long been the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit." (*Id.*, p. 791.) It is apparent from the AVCO decision, for example, that the acquisition of vested rights is the only substitute for a valid building permit. A mere favorable balance of equities is not sufficient for this purpose. The trial court's failure to find that Real Party had acquired vested rights to proceed with construction is absolutely fatal to its judgment given the building permit's invalidity as demonstrated above.

Despite the fact that decisions interpreting this vested rights doctrine seem to treat it as an affirmative defense and impose upon developers the burden of demonstrating its availability (see *AVCO, supra*), Real Party never referred to this doctrine in its Answer. In its Memorandum of Points and Authorities in Opposition to the Petition for Writ of Mandate, Real Party simply asserts that Petitioners have failed to contest the validity of administrative findings supporting the acquisition of vested rights by Morton Park Associates. However, since, as shall be demonstrated below, the existence of vested rights presupposes the issuance of a permit, (*AVCO, supra*, p. 793), and since the issuance of a building permit presupposes the completion of all administrative appellate procedures conducted in connection with an application for its issuance, (*Russian Hills Improvement Association* v. *Board of Permit Appeals of the City and County of San Francisco* (1967) 66 Cal.2d 34 [56 Cal.Rptr. 672, 423 P.2d 824]), it was not legally possible for Real Party to have acquired vested rights at any time during the administrative proceedings held prior to this litigation's commencement, and any administrative determinations purporting to validate Real Party's acquisition of vested rights were without legal force and effect. It was incumbent upon Real Party to demonstrate its acquisition of vested rights in a post-administrative setting. The trial court's failure to find that Real Party had in fact acquired such vested rights is fatal to its judgment.

Even assuming that the trial court had made legal and factual findings necessary to sustain a vested rights defense, reversal would be required, since the evidence would not sustain such findings. This shall be demonstrated below. Appellants shall sustain each of the following contentions in this portion of the brief: 1. Government Code section 65860 precluded Real Party from relying in good faith upon its building permit at any time.

2. Prior to the commencement of Appellants' administrative challenges to the building permit, Real Party had not undertaken activities sufficient to establish its acquisition of vested rights.

3. Even were contention # 1 to be ignored for discussion's sake, any activity undertaken by Real Party following the commencement of Appellants' administrative challenges to its permit could not have reflected Real Party's good faith reliance thereon.

4. Furthermore, any activities undertaken prior to the completion of administrative proceedings held in connection with Petitioner's challenges to the permit precede the permit's issuance and consequently cannot be counted as assisting the acquisition of vested rights.

Appellants need only sustain one of these contentions to undercut Real Party's acquisition of vested rights.

### 1. *The Impact of Government Code Section 65860:*

The building permit was obtained by Real Party on October 17, 1984, although, as shall be demonstrated below, it was not issued until the completion of administrative proceedings on April 16, 1985. In any event, Real Party was confronted well before October 17, 1984, with the fact that under Government Code section 65860, the City was under a statutory duty to have established conformity between existing zoning and its general plan by no later than July 1, 1982. It is undisputed that while existing zoning for the area in question was compatible with Real Party's forty-five unit development, the plan for this area would have limited such a development to fifteen units. As of October 17, 1984, however, the developers

are deemed to have known that the rezoning of their target property was required by statute and was over two years overdue. The question presented by this case is whether they are entitled to claim a good faith belief at any time on or after October 17, 1984, that they were entitled to build forty five units on the property at issue.

As the Supreme Court observed in *Avco, supra:* "In resolving this issue, we do not write on a clean slate. In *Spindler Realty Corp.* v. *Monnong, supra,* 243 Cal.App.2d 255 [53 Cal.Rptr. 7], a builder whose property was zoned for multiple residential use, sought and obtained a grading permit and other approvals from the City of Los Angeles to prepare a building site. The permit did not refer to the number, size and type of buildings to be erected on the site. In good faith reliance on these permits, Spindler graded the property and submitted building plans for the construction of a high rise apartment complex. It spent over $300,000 for development costs. However, before the building plans were approved, the property was rezoned for single family residential use.

"Spindler contended, as does Avco here, that it had acquired a vested right to build multiple dwellings on the lot because, in good faith reliance on the existing zoning and the permits issued by the city, it had incurred substantial expenses to develop and grade the property. The court held that, while Spindler had a vested right to complete grading, it did not have a vested right to build the structures permitted by the prior zoning.

"The court reasoned that Spindler knew when obtaining the grading permit that it would be required to secure a building permit in order to construct buildings, and that a grading permit is not the equivalent of a building permit even though a grading permit was required under the city's ordinances before a building permit could issue and such a permit would be granted only for building purposes. Further, opined the court, although Spindler had proceeded in good faith for two years to complete its engineering and architectural plans for the apartment house complex in reliance on multiple residential zoning and the authorizations granted by the city, *Spindler was taking a calculated risk in continuing its preparations at least from the time its learned, prior to completion of grading, that the city was considering rezoning the property." (Avco, supra,* 17 Cal.3d at p. 792; italics added). The Supreme Court in *Avco, supra,* upheld *Spindler* as controlling and rejected Avco's own vested rights claims. The *Spindler* analysis obviously destroys Real Party's vested rights claims, however, for it demonstrates that Morton Park was "taking a calculated risk" in proceeding with construction at all times in this litigation given its knowledge on, before and after October 17, 1984, that the City was not only "considering rezoning the property" but was also, as of October 17, 1984, more than two years in default of a statutory obligation to do so! Morton Park is deemed to have been aware of the Plan, Government Code section 65860 the City's statutory obligation to rezone the area in question and the fact that the City was even then well behind schedule in discharging this duty. Any purported reliance on a building permit is no more sufficient to establish Real Party's compliance with the good faith requirement than was comparable reliance in *Spindler, supra,* 243 Cal.App.2d 255.

For this reason alone, Real Party's vested rights claim must fail, literally by operation of law.

2. *Real Party's Reliance Upon Its Permit Prior to Notification of Appellants' Challenges Thereto*

Even were the previous discussion to be ignored for discussion sake, there can be no question that Real Party proceeded to build at its own risk after having received notice regarding Appellants' administrative challenges to its building permit. This notice was received, according to Real Party's evidence, on November 7, 1984. Assuming that the permit is deemed to have been issued for vested rights purposes on October 17, 1984, rather than upon the conclusion of administrative proceedings, *(infra),* and assuming that Government Code section 65860 is deemed insufficient to have placed Real Party on notice that it was proceeding at its own risk at all times in this project, the best possible argument which Real Party can make is that it acquired vested rights as a result of work performed between October 17, 1984, and November 7, 1984.

It is therefore necessary to examine the extent of Real Party's construction activities during this period in order to determine whether they were sufficiently substantial to establish the emergence of vested rights to proceed with construction. That any work undertaken after

November 7, 1984, cannot qualify as contributing to the acquisition of vested rights is clear from the above-quoted passage from *Avco, supra,* 17 Cal.3d 785, which demonstrates that activity conducted after a developer acquires notice concerning the defects characterizing its permit is not undertaken in good faith reliance thereon but is instead undertaken as "a calculated risk." (*Avco, supra,* p. 792).

According to Real Party's own evidence, no actual construction was undertaken at the site during this period between October 17, 1984, and November 7, 1984. On October 17, 1984, Real Party obtained a permit to build a retaining wall. On October 22, 1984, it demolished four single family dwellings on the lot but performed no grading at this site. Two days later, Real Party was ordered to repair a broken sewer line. On October 31, 1984, Real Party installed a protection fence at the site, and on November 7, 1984, the day upon which it received notice of Appellants' challenges to [its] permit, it obtained a permit to repair the broken sewer line. (See Exhibit R to Real Party's Memorandum of Points and Authorities in Opposition to Petition for Writ of Mandate, Tab 18 in Record on Appeal). No other work was performed during this period.

During the period herein under discussion, Real Party did not even accomplish any building [on] the site. In this respect, it efforts were no more substantial than those found to be insufficient in *Spindler, supra,* to establish the existence of vested rights to *build* rather than simply *grade.* Plainly, Real Party's efforts were not sufficiently substantial to establish its acquisition of vested rights to build in accordance with the building permit.

That this is so is beyond question in light of admissions made by counsel for Real Party before the trial court as late as May 24, 1985, that work performed up until that date would be adaptable to a fifteen unit design. (Page 10, transcript, May 24, 1985, Tab 9, Exhibits). This indicates that Real Party had not, even after the commencement of judicial proceedings, performed sufficient work to acquire vested rights with respect to the permit-authorized 45 unit project as opposed to the plan-authorized development of 15 units.[2] Even as of that late date, in other words, Real Party had not performed work sufficient to establish its vested rights to proceed with work in accordance with its building permit.

This concession is confirmed by still further evidence. During trial court proceedings held in connection with Appellants' mandate petition, Real Party represented that prior to April 17, 1985, the commencement date of judicial proceedings in this case, (Tab 1) Real Party had only undertaken grading, excavation, site preparation work and partial retaining wall construction at the location at issue. (Tab 23, p. 20, transcript, Sept. 10, 1985.) Even as of April 17, 1985, Real Party had not acquired vested rights to proceed with a 45-unit development at this location, for its work was, even at that date, compatible with a plan-consistent fifteen unit structure. It was, furthermore, conceded by Real Party that no work performed following April 17, 1985, the commencement date of this litigation could assist its quest for acquisition of vested rights in this case. (Tab 23, transcript, Sept. 10, 1985, p. 18.)

3. *Real Party's Calculated Risk in Proceeding After Acquisition of Notice Concerning Appellants' Administrative Permit Challenges.*

This point has already been addressed in the preceding sub-section of this brief.

4. *The Non-finality of Real Party's Permit Between October 17, 1984, and the Conclusion of Administrative Proceedings on April 16, 1985.*

If Appellants are correct in maintaining that a building permit is not deemed to have been issued for vested rights purposes until the conclusion of administrative proceedings held in connection with challenges to its propriety, no work performed before April 16, 1985, could assist Real Party in its acquisition of vested rights. For work performed in anticipation of a building permit does not contribute to vested rights' accrual. (*Avco, supra,* 17 Cal.3d 785.)

---

[2]This representation was made in an attempt to convince the trial court that issuance of a preliminary injunction would be unnecessary. Appellants' preliminary injunction was denied. (Tab 10.) Real party obtained a legal benefit from these assurances and is therefore judicially estopped from repudiating them at present. The trial court's reliance upon these assurances is clear from the transcript.

Real Party and Respondents attempt to distinguish the *Russian Hills* decision, in which it was held that a building permit is not deemed to have been issued until administrative challenges to its validity have been exhausted. (66 Cal.2d 43). Real Party urges that this case interpreted a San Francisco ordinance which changed the common law, thereby losing any relevance to Los Angeles. (RPB 43.) Yet the *Russian Hills* opinion explicitly makes clear that the ordinance under consideration did not effect a departure from established administrative law principles. (*Id.*, p. 40.) The Court stated: "Nothing in the history of section 150 lends the slightest support to the suggestion that it was designed to protect the mere *hope* that a pending permit application would ultimately receive final approval. We have long held that one who is not yet armed with a presently effective municipal license to proceed with construction must assume the risk that, 'before final action [has] been taken on [his] application,' [citation], the law might be changed so as to require that his application be denied. [Citations.] Defendants have suggested no reason, historical or otherwise, to suppose that section 150 contemplated a departure from this established rule.

". . . To constitute the 'lawful granting' of a permit, an action must therefore confer a fixed right, not subject to divestment pursuant to future legislation. Yet the action of the permit bureau in issuing a permit *cannot* in itself confer such a right. Even after a permit has been lawfully issued by the bureau, the Board of Permit Appeals necessarily retains discretionary power to order that the permit be denied because of a pending change in the law. At most, therefore, the lawful *issuance* of a permit by the bureau can confer a *conditional* immunity, hardly the kind of shield contemplated by a statute designed to fix the rights of a permittee upon a certain date." In a footnote, the Court continued: "A contrary conclusion would abrogate the right of all interested parties . . . to urge in formal hearings before the Board of Permit Appeals the *impropriety* of issuing a permit in conflict with an imminent zoning change . . . ." (*Russian Hills, supra,* pp. 40, 41, fn. 18). There is not one word of the [preceding] passage which is inapplicable to Los Angeles. Here, as in San Francisco, building permits may be subject to timely administrative challenge. There is nothing in this City's scheme of ordinances to which Real Party or Respondents might point as tending to support the view that a building permit is deemed final even prior to the exhaustion of administrative remedies attacking its propriety. Basic principles of administrative law would counsel against such a pre-appellate hypothesis of finality, as was indicated by the Supreme Court in *Russian Hills.* Here, as in San Francisco, Real Party's pre-appellate issuance thesis would subvert the rights of interested parties "to urge in formal hearings before the Board of [Zoning] Appeals the *impropriety* of issuing a permit in conflict with an imminent zoning change . . . ." (*Russian Hills, supra,* fn. 18.)

It was only later in its opinion, after having made the foregoing observations, that the Supreme Court, addressing contentions from the developer, pointed out that San Francisco's code scheme was consistent with the court's analysis, since the Code reflected distinctions between "issuance" and "granted" as legal concepts. (*Id.*, pp. 42-43.) The fact that San Francisco's ordinance structure is consistent with general administrative law principles has been improperly converted by Real Party (RPB 43-45) into an argument that *Russian Hills* is limited in its applicability to San Francisco. This argument is fatuous.

Real Party (RPB 44) and Respondents (RB 25-26) also attempt to distinguish the San Francisco appellate system from the Los Angeles scheme by noting that permits in the former city bear a notation that they are issued subject to appeal within ten days. However, both Real Party and Respondents decline to observe that at no point in its discussion did the Supreme Court rely on this fact in *Russian Hills.*

Sound reasons justify the thesis advanced in this brief and in *Russian Hills* that building permits do not become final for vested rights purposes until the exhaustion of administrative challenges to their issuance. A contrary rule vitiates the rights of those who wish to challenge initial permit decisions. If developers could acquire vested rights by purporting to rely upon initially granted permits even during administrative proceedings, they could render any adverse administrative determinations moot through the acquisition of intervening vested rights. It is irrational to conclude that this city's appellate process was designed to accomplish such pointless results. (See *Russian Hills, supra,* 66 Cal.2d pp. 41, fn. 18, 43-44). As was observed in *Russian Hills:* "Our ruling that a permit is not 'lawfully granted' until the appropriate channels of administrative review have been exhausted enables *cities* to deter

last-minute efforts to circumvent changes in the zoning laws." (*Id.*, p. 46, italics added). The applicability of this passage to the present case is all too obvious. The court continued with language making obvious its intent to articulate generally applicable administrative law principles for land use controversies: "More broadly, our interpretation of section 150 serves to prevent the proliferation of non-conforming structures. A contrary construction of that section would subvert these objectives, both of which are vital to the achievement of order in the volatile development of modern urban centers." (*Id.*, p. 46.)

## B. OTHER EQUITABLE CONCERNS:

Real Party claims that Appellants slept on their rights. This is ridiculous. The building permit was initially issued on October 17, 1984. Appellants filed timely administrative appeals. The day after their exhaustion, Appellants commenced this litigation. Any claim of undue delay by Appellants staggers credulity. Here, as in *Buena Vista Gardens, supra,* "Appellants have challenged approval of the project at every stage. The doctrine of laches does not apply to the case at bar." (*Id.*, 175 Cal.App.3d 308.) Appellants were more than entitled to exhaust their administrative remedies before seeking judicial relief and undoubtedly would have been confronted with an exhaustion argument had they not done so. Real Party's decision to proceed with construction efforts after learning about Appellants' challenges to its permit was a calculated risk. It does not constitute an equitable consideration in Real Party's favor. (See *Avco, supra*).