[No. D012162. Fourth Dist., Div. One. June 1, 1992.]

ROBERT CONSAUL et al., Plaintiffs and Appellants, v.
CITY OF SAN DIEGO, Defendant and Respondent.

COUNSEL

Fischbeck & Oberndorfer and William L. Fischbeck for Plaintiffs and Appellants.

John W. Witt, City Attorney, C. Alan Sumption, Chief Deputy City Attorney, and Larry E. Renner, Deputy City Attorney, for Defendant and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—The issue presented in this appeal of the superior court's order denying a petition for writ of mandate brought by appellants Robert and Eva Consaul and Thomas Ahrens is whether certain dwelling unit allocations made by the City of San Diego (the city) to Ahrens's development project, under the terms of an interim development ordinance (IDO), created a vested right in Ahrens to proceed with the development of the project, even though no building permits were applied for or obtained as contemplated by the IDO procedure. We conclude the trial court correctly denied Ahrens's petition for writ of mandate which would have required the city to set aside its rezoning decision which placed the subject property in single-family residential zoning, some time after a preliminary dwelling unit allocation of 26 units had been made under the IDO. The record demonstrates the city's action was neither arbitrary, capricious, nor totally lacking in evidentiary support. (Code Civ. Proc.,[1] § 1085.) Neither does the record show any prejudicial abuse of discretion by the city in taking the zoning action that it did. (§ 1094.5, subd. (b).) We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

According to the petition for writ of mandate, petitioners and appellants Robert and Eva Consaul are the owners of the subject property, a 1.06-acre

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

parcel of undeveloped land in a highly urbanized area of the city. Petitioner and appellant Thomas Ahrens (whose last name we sometimes use to represent all the owners of the subject property) owns an equitable interest in the property by virtue of a written agreement of sale with the Consauls.

This undeveloped 1.06-acre parcel is part of a larger 1.5-acre property owned by the Consauls. The undeveloped area is a remnant canyon with some degree of slope on a majority of the property, and is located downhill from the remainder of the Consauls' land. The uphill area of the Consauls' land (not the subject of this action) is now developed with a single-family residence and two apartments (in one of which Thomas Ahrens resides).

According to Ahrens's declaration submitted in support of the petition for writ of mandate, there are a number of single-family homes in the area at the bottom of the canyon where the subject property is located. Also nearby, within 500 feet of the property, is a 250-unit apartment building, and other multifamily units are located to the north, south, and going uphill toward the east. According to Ahrens, at the top of that bank, the "traditional single family neighborhood of Point Loma begins," but that neighborhood lies far above the subject property.

The declarations submitted by the city in opposition to the petition give a different view of the property's surroundings. City planner William Levin, the supervisor of city planner Chris Jacobs who was directly involved with the project, states that the area surrounding the property on three sides is "clearly low density, single-family residential in character. The fourth side (north) has a multi-family character but was topographically separated from the subject property at a much higher elevation."[2] Jacobs's declaration states he field-checked the site three times, once with his supervisor. He found that the property is abutted on three sides by single-family zoned areas, and that the multifamily zoned areas nearby "are physically removed from much of the site." In summary, he said the lower portion of the land is surrounded by single-family units.

In 1986, Ahrens retained engineers and surveyors to process a subdivision map, splitting the property into two parcels, the one at the top of the hill with the existing structures on it, and the subject property, parcel 2. At that time, the existing zoning on the property was R-1000 (multifamily), which, combined with the physical constraints on the development of the site relating to slopes, hillsides, and grading for ingress and egress, resulted in a maximum

[2]In supplemental briefing, the city points out that Levin must have misread the maps where he characterized the fourth, multifamily side of the property as being to the north; it is actually to the northeast.

of 44 units that would fit on the property. For purposes of processing the map, the city required that access be planned from Curtis Street at the top of the hill, at an estimated cost of $134,000 for construction. The subdivision map was recorded in February 1987, after Ahrens spent $7,200 and many hours preparing it and meeting with city staff. Ahrens then began plans for developing 44 units on the property by hiring an architect, a project planner and a civil engineer.

We now undertake to summarize the complex land use planning regulations applicable to this property since the time the subdivision map was approved. First, the record shows the trial court was supplied with the text of municipal ordinances setting forth the city's general power to create a general plan and to zone property. (San Diego Mun. Code (S.D.M.C.), § 101.0201 et seq.) Pursuant to that general plan, community plans are required to be prepared.

On July 14, 1987, the city adopted a comprehensive community plan for the peninsula area where the property is located. This plan was prepared with the assistance and input of local residents, acting as a planning group which made recommendations to city staff for changes in both land uses and zoning in this area. The subject property is designated on the plan (which supersedes the Coastal Plan of 1981) as multifamily. Although no changes were suggested for Ahrens's parcel at that time, Ann Jackson, the chairperson of the community planning group, and city planner Levin later characterized that omission as a mistake in the plan.

On July 21, 1987, a week after the local community plan was adopted by city, the city council adopted an IDO placing a limitation of 8,000 on the number of dwelling units allowed to be authorized citywide, supplemental to the provisions of local plans and zoning. The effective period of the IDO was to be 18 months. Each area of the city was allocated a "fair share" of these 8,000 annual dwelling unit allocations; the subject area (the Peninsula Community) was allocated 96 units per year. Applicants for these allocations were required to submit specific information required by the IDO administrator (defined as the planning director, city manager, and city engineer or their designees), and allocations were made on a quarterly basis.

Shortly after the IDO was adopted, the city council enacted another growth management ordinance, an interim single family protection ordinance (INSFPO) in August 1988, the purpose of which was to prevent accelerated multifamily residential development in single-family neighborhoods where multifamily zoning was in effect. The parties agree this ordinance by its terms was not directly applicable to the subject property, which

is vacant land. However, a companion land use planning procedure does play a part in this story: the classification of single-family neighborhoods project through which the city council directed the planning department, beginning in January of 1989, to work with community planning groups citywide to identify and map areas appropriate for classification as protected single-family neighborhoods.[3] At the same time, the community plan zoning designation map was being reviewed and amended, in consultation with community planning boards.

Pursuant to the procedure set forth in the IDO, Ahrens submitted by May 1987 an application for dwelling unit allocations that included detailed site and grading plans, elevations and locations of all improvements. Meetings with city staff resulted in the development proposal being reduced from 44 to 26 units. Ahrens presented the proposal to the community planning group, which initially took no action.

By the city's letter of November 4, 1988, Ahrens received a dwelling unit allocation for 18 units of the 26 requested. An additional allocation was made by letter of March 2, 1989, for the additional eight units. The first letter stated that Ahrens could proceed within one year of the date of the letter (Nov. 4, 1988) "to file for a building permit application and plan check with the Building Inspection Department." The second letter contained no such deadline language, but did state that Ahrens could proceed "immediately" to apply for the building permit and plan check, and that the IDO was scheduled to expire May 21, 1989.[4]

The declarations submitted to the trial court contain conflicting accounts about the matter of building permit applications. Ahrens states he was told by "the Planning Department" after he received his initial allocation that he could not apply for any building permits until the entire 26-unit IDO allocation was received for the project. He also states that when he inquired about applying for building permits in July 1989, when he received notice the property might be rezoned to single-family status, he was told there was not enough time for those permits to be approved before the planning commission or city council hearings on the proposed rezone were held.

[3]Originally, the neighborhood classification project was to be contained in a growth management element of the general plan, submitted to the electorate in November 1988. The voters turned down that element, but the city council continued to pursue the single-family neighborhood protection project through planning department action and city council resolutions, rezonings, and public hearings on the neighborhood classification project.

[4]Although the IDO is no longer in force, the issues presented by this appeal concerning the development allotment method of growth control (see *Pacifica Corp.* v. *City of Camarillo* (1983) 149 Cal.App.3d 168, 176 [196 Cal.Rptr. 670]) are of continuing public interest and warrant the publication of this opinion. (Cal. Rules of Court, rule 976(b)(3).)

In contrast, city planner Farrar states there was no planning department policy forbidding development projects from being approved for building permits in phases of the size of an approved partial allocation of dwelling units. City planner Chris Jacobs states that he does not recall discussing with Ahrens the matter of whether there was still time in July 1989 for Ahrens to submit building plans to avoid the impact of the proposed rezoning, and it is unlikely he would have told Ahrens he could not submit the plans. He further states: "I do recall receiving telephone calls in spring or early summer 1989 from at least one property owner and from other concerned citizens about the Curtis Street property [city's designation for Ahrens's property] as to whether the Planning Department retained any discretionary approval authority over the proposed 26-unit condominium project on the R-1000 zoned property. This answer to this question was no."

After the city planning department began working with community planning groups on the single-family neighborhood classification project, the chairperson of the peninsula planning group wrote a letter to city staff dated April 27, 1989, under the subject heading: "Protected Single-Family Neighborhood Maps." She stated the group had voted to suggest that Ahrens's property (along with three others) be investigated for single-family residential zoning, due to concerns about traffic and other noise levels, the slope of the land and congestion in the area. In response, the city planning department investigated the site and recommended it be included on the neighborhood classification map and rezoned to single-family residential status.

In July 1989, the city planning commission conducted a noticed public hearing on an agenda item listed as: "Classification of Single-Family Neighborhoods and Related Rezonings and Plan Amendments in Peninsula." Ahrens appeared personally and through counsel to oppose the rezoning. The planning commission voted six to zero to recommend adoption of the maps identifying the protected single-family neighborhoods, and enactment of the related rezonings and amendments to the community plan, including the subject property as single-family.

Thereafter, the city council noticed a public hearing for August 8, 1989, on an agenda item titled the same as that of the planning commission, which included the subject property rezone. The matter was continued until September 11 to allow Ahrens to present his project to the community planning group in August. Although the planning group had previously voted on the matter, it heard the presentation in compliance with the city council's request. However, it made no change in its vote recommending single-family classification for the property.

At the city council's continued hearing on the classification of single-family neighborhoods, Ron Roberts, the city council representative for the

area, spoke in favor of the rezoning of the subject property, stating he had viewed the property and had concluded:

"[T]his piece of property is exactly what we were concerned about in the older areas of the community, where prior community plans really had not taken into account topography, the neighborhoods, the sort of detailed physical setting. This is very much a piece of a single-family neighborhood."

Councilman Roberts further noted that access to the property would be through a single-family area surrounding the proposed development. He referred to the steep slopes on the property and the high retaining wall that would be required to build an access road, and commented, "[I]t just seems to me this is exactly, exactly, the type of property that we aimed these various programs at."

After presentations by those in favor of and in opposition to the proposed rezoning, the city council on September 11, 1989, voted unanimously to (1) adopt a resolution approving the protected single-family neighborhood maps and releasing those areas not mapped for classification; and (2) adopt a resolution approving related amendments to the community plan as well as rezoning of Ahrens's property to single-family status.

On December 26, 1989, Ahrens filed a petition for writ of mandate (ordinary mandamus, § 1085) in the superior court. Several theories were pled to support the contention the rezoning was invalid: (a) it was done in violation of previously vested rights, which the city was estopped to deny; (b) it violated the city's promise under the IDO allocation to allow the applicant one year to develop the twenty-six proposed units, and the city was estopped from denying such a right; (c) the rezoning constituted an arbitrary and capricious act of downzoning of a single parcel, without adequate weighing of conflicting interests; and (d) it constituted a taking of property without just compensation resulting in no economically viable use of the property. The relief sought was invalidation of the rezoning ordinance and mandated rezoning to multifamily use for a prescribed period.

The city's response to the petition included its answer and a demurrer on the procedural ground that it was not timely filed. Ahrens replied. City filed supplemental documents with the court, including a request for judicial notice of the city charter, municipal code, ordinances and resolutions, and other general planning material. At the hearing on the matter, the superior court explained its approach had been to examine the basis for the city's action to decide if it was reasonably related to the public welfare. After hearing argument, the court agreed to take judicial notice of particular

municipal code sections concerning land development (grading) regulations. (S.D.M.C., § 62.0401 et seq.) After taking the matter under submission, the trial court issued a minute order dated March 7, 1990, denying the petition for writ of mandate and overruling the demurrer.

Ahrens timely appealed.[5]

### DISCUSSION

### I

### *Standard of Review*

Ahrens's petition for writ of mandate sought relief in ordinary mandamus under section 1085 which would have declared that the city's actions were invalid as applied to the subject property and would have ordered the city to rezone the property to multifamily status to permit Ahrens to pursue the development project. ▆ Ahrens's characterization of this action as sounding in ordinary mandamus was correct under *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 514-521 [169 Cal.Rptr. 904, 620 P.2d 565], where the Supreme Court held: "California precedent has settled the principle that zoning ordinances, whatever the size of parcel affected, are legislative acts." (*Id.* at p. 514.) "[R]ezoning of property, even a single parcel, is generally considered to be a quasi-legislative act [citations], subject to review under ordinary mandamus. The standard for review of a quasi-legislative act is whether the action was arbitrary or capricious or totally lacking in evidentiary support, or whether the agency has failed to follow the procedure and give the notices required by law. [Citation.]" (*City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 238-239 [227 Cal.Rptr. 899].)

---

[5]Following publication of the original opinion in this case, filed June 13, 1991, this court granted the city's petition for rehearing to consider its arguments that the opinion (1) mistakenly concluded the city inappropriately used the INSFPO to rezone the property; (2) incorrectly described the property and its surroundings; (3) improperly concluded no more discretionary permits remained to be obtained for the project; (4) applied an incorrect standard of review; and (5) did not clearly set out directions on remand.

After granting rehearing, this court requested and considered supplemental briefing from the parties, and reviewed correspondence in the nature of amicus curiae briefing from the following: the Cities of West Hollywood and Malibu, the League of California Cities, the City of Lompoc, the City of Roseville, the City of Walnut Creek, the City of Anaheim, the City of Alameda, the City of Napa, the City of Pleasant Hill, the City and County of San Francisco, the City of Pacifica, the City of Tustin and the City of Livermore. We have also reviewed for the second time this 773-page record, and are satisfied despite the somewhat different version of facts presented in the dissenting opinion that our factual statement accurately reflects the record and clarifications made thereof in the rehearing materials and the supplemental briefing.

At the hearing on the petition for writ of mandate, the trial court examined the file to determine what factors the city council relied on in making its rezoning decision, in deciding whether the action taken by the city was "reasonably related to the public welfare." This procedure was consistent with the duty of the trial court in an ordinary mandamus action. Our review of the trial court's ruling is conducted according to the usual principles: In reviewing determinations of fact, all factual matters are viewed most favorably to the prevailing party, with all conflicts resolved in favor of the judgment appealed from; we determine only whether any substantial evidence supports the conclusion reached by the trier of fact. (*Committee for Responsible Planning* v. *City of Indian Wells* (1989) 209 Cal.App.3d 1005, 1010-1011 [257 Cal.Rptr. 635].) Regarding the trial court's use of a particular legal standard, in the absence of a contrary indication in the record, we assume a correct standard was used in ruling on the petition. (*Id.* at p.1011. ■ " 'A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193], original italics.)⁶ )

Complicating our application of these basic rules, however, is the peculiar nature of the rezoning decision made here. ■ Arguably, at least, it was made as "a determination of specific rights in regard to a particular factual situation rather than the formulation of broad policy applicable to future situations. [Citation.]" (*City of Carmel-by-the-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d at p. 239.) Such quasi-judicial administrative decisions are reviewed at the trial level by proceedings in administrative mandamus under section 1094.5. (*Ibid.*) In an abundance of caution, therefore, we find it necessary to construe this petition for writ of mandate as raising issues sounding both in ordinary mandamus and administrative mandamus. Under section 1094.5, subdivision (b), "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or

---

⁶The order denying the petition for writ of mandate and overruling the city's demurrer was a final determination of the entire action. As such we construe the order to be an appealable final judgment. (§ 1064; *Cody* v. *Justice Court* (1965) 238 Cal.App.2d 275, 277, fn. 1 [47 Cal.Rptr. 716]; see *Avila* v. *Standard Oil Co.* (1985) 167 Cal.App.3d 441, 445 [213 Cal.Rptr. 314].)

decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).)[7]

Our review of the trial court's ruling denying the petition for writ of mandate is conducted in two stages: we first consider whether the City's actions, according to the standards of ordinary mandamus, were arbitrary, capricious, totally lacking in evidentiary support, or conducted without the proper notice and procedure. (*City of Carmel-by-the-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d at pp. 238-239.) Regarding the administrative mandamus issues we deem to be raised by the pleading, "our duties are identical to those of the trial court in that we are required to conduct our own independent review of the entire administrative record. [Citations.]" (*Id.* at p. 239.) This latter review is conducted under the substantial evidence test. (*Ibid.*; § 1094.5, subd. (b).)

## II

### *Vested Rights Doctrine*

### A

### *Development of the Doctrine*

The leading case in the development of the vested rights doctrine as applied to land use law is *Avco Community Developers, Inc.* v. *South Coast Regional Com. (Avco)* (1976) 17 Cal.3d 785, 791-799 [132 Cal.Rptr. 386, 553 P.2d 546].

---

[7]Section 1094.5, subdivision (c) prescribes two different standards of review for the trial court to apply as appropriate in administrative mandamus: substantial evidence or independent judgment. "The independent judgment test is reserved for those situations where the administrative decision substantially affects a fundamental, vested right acquired by the petitioner [citations]. The question of what constitutes a fundamental, vested right must be answered on a case-by-case basis and considers not only the economic aspects involved but also 'the effect . . . in human terms and the importance of it to the individual in the life situation.' [Citation.] Even so, it is necessary to allege a deprivation of the right to property or to a livelihood [citation]." (*Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 728 [135 Cal.Rptr. 588].) In *San Marcos Mobilehome Park Owners' Assn.* v. *City of San Marcos* (1987) 192 Cal.App.3d 1492, 1499-1502 [238 Cal.Rptr. 290], this court noted that when particular rights are analyzed to determine whether they possess a fundamental nature, "the court manifests slighter sensitivity to the preservation of purely economic privileges." (*Id.* at p. 1499.) In this case, Ahrens's claim of a vested right to develop the property in accordance with the dwelling unit allocations made under the IDO falls short of an alleged entitlement to a right that is important to his life situation, the deprivation of which constitutes impairment to his right to pursue a livelihood or property essential thereto. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242].) Substantial evidence review in the administrative mandamus context is therefore appropriate. (§ 1094.5, subd. (c).)

"It has long been the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. [Citations.] Once a landowner has secured a vested right the government may not, by virtue of a change in the zoning laws, prohibit construction authorized by the permit upon which he relied." (*Avco, supra,* 17 Cal.3d at p. 791.)

The Supreme Court in *Avco* established several rules for the application of the vested rights doctrine: First, "neither the existence of a particular zoning nor work undertaken pursuant to governmental approvals preparatory to construction of buildings can form the basis of a vested right to build a structure which does not comply with the laws applicable at the time a building permit is issued. By zoning the property or issuing approvals for work preliminary to construction the government makes no representation to a landowner that he will be exempt from the zoning laws in effect at the subsequent time he applies for a building permit or that he may construct particular structures on the property, and thus the government cannot be estopped to enforce the laws in effect when the permit is issued." (*Avco, supra,* 17 Cal.3d at p. 793.)

Second, the Supreme Court in *Avco* reiterated that a landowner has no vested right in existing or anticipated zoning. (*Avco, supra,* 17 Cal.3d at p. 796.) Preliminary approvals received from the government for development, such as zoning of land for a particular purpose, are not sufficient to allow a developer a vested right to build on the land in accordance with former law. Allowing such preliminary approvals to determine the permissible use of land could seriously impair "the government's right to control land use policy." (*Id.* at p. 797.) Moreover, "it is settled that the government may not contract away its right to exercise the police power in the future. [Citations.]" (*Id.* at p. 800.)

In *Avco,* the Supreme Court was presented with the question of whether another type of land use permit, such as a conditional use permit, might create in a developer vested rights similar to those created by a building permit. Arguably, if such a form of governmental approval afforded "substantially the same specificity and definition to a project as a building permit," it might place the government on adequate notice as to what approvals it had supposedly granted. (*Avco, supra,* 17 Cal.3d at p. 794.) The Supreme Court did not decide that question, however, since the record in that case showed that none of the permits obtained related to an identifiable building.

Here, Ahrens argues that the IDO dwelling unit allocations which he received in the two letters from the city were based on specific information he provided the planning department about the proposed project, and

that the allocations represent a type of governmental approval which was sufficient to create in him a vested right to proceed with the development project. He relies on *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 651-653 [150 Cal.Rptr. 242, 586 P.2d 556], a Subdivision Map Act case, for the proposition that if all discretionary approvals are obtained for a project and only ministerial approvals remain, the right to develop the project is subject to vesting. His arguments, however, are unsupported by the language of the IDO, the letters granting the dwelling unit allocations, or the applicable authority. We shall explain.

B

*Structure of the IDO*

First, we note that by its own terms the IDO is an interim measure enacted for an 18-month period to allow for land-use planning controls upon residential development to be enacted pending the completion of a general reevaluation and adoption of a general plan update. These interim regulations enacted by the ordinance provide that no residential building permits shall be granted unless the application for building permits has been processed in accordance with the IDO procedures for dwelling unit allocations.

Section 6 of the IDO, "PROCEDURE FOR DEVELOPMENT APPROVAL DURING INTERIM PERIOD," provides that the city shall develop an interim development allotment application form to contain such information on the form as deemed appropriate by the administrator of the ordinance. That administrator was directed to take into account certain enumerated factors in formulating standards and criteria for the review of applications under the IDO. The administrator was further directed to conduct a quarterly "dwelling unit allocation" for each community plan area, taking into account any development approvals granted prior to the effective date of the IDO, such as vesting tentative maps, development agreements, "or other entitlement which may create a legally vested right to development of the . . . project under California law." The procedure set out in section 6J of the IDO provides for an applicant who received a dwelling unit allocation to have one year to submit to the building inspection department a building permit application form "to exercise the entitlement to the units represented by the allocation." If building permits issued pursuant to the IDO procedure were allowed to expire or if entitlement to use of such permits were waived, the ordinance provided that a replacement allocation could be made in the applicable community plan area.

In section 9A of the IDO, language is set forth providing that the ordinance shall not affect in any manner any provisions of the municipal code

relating to the permissible use of property, density of development, design and improvement standards. Section 9A of the IDO further provides that the city's zoning, subdivision, building, or other regulations remain in effect and operative without limitation with respect to all residential development. It is next provided in section 11 of the IDO that all quarterly allocations and other grants under the IDO were to receive a "full zoning plan check by the Building Inspection Department." Section 11 of the IDO further provides:

"No [IDO] variance request, appeal or released project is to be brought forth for public hearing for potential allocation unless full zoning code compliance is present and any required discretionary permits approved and recorded."

Turning to the letters sent to Ahrens by the city setting forth his IDO dwelling unit allocations, the first of those letters, dated November 4, 1988, provides that an allocation of 18 units was made, and Ahrens was allowed to proceed as the applicant within 1 year of the date of the letter "to file for a building permit application and plan check with the Building Inspection Department of [the city]." In the next letter, dated March 2, 1989, Ahrens was notified of an allocation of eight additional units, and was told that he could proceed as the applicant "immediately to file for a building permit application and plan check with the Building Inspection Department of the City of San Diego." The letter further stated that the IDO was scheduled to expire May 21, 1989.

Under Ahrens's interpretation of the IDO, he was irrevocably granted one year from the date of the November 4, 1988, letter to file for and receive a building permit and plan check; alternatively, he claims that a new year begin to run with the sending of the March 2, 1989, letter, even though that letter did not refer to any additional one-year period. In the interim, however, before Ahrens's building permit application and request for a plan check were ever made, the city had completed rezoning of the property in September 1989.

## C

### Application of the Doctrine

It is evident that the IDO dwelling unit allocation process created a separate layer of regulation between the subdivision map stage of the proceeding and the ultimate grant of a building permit application. To analyze the rights created by this type of regulation, we apply the established rule that "the rights which may 'vest' through reliance on a government

permit are no greater than those specifically granted by the permit itself. [Citations.]" (*Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858, 866 [201 Cal.Rptr. 593, 679 P.2d 27].)

In this case, we conclude that even though a dwelling unit allocation was made, no vested right to proceed with the development project was created thereby. The language of the IDO and the letters notifying Ahrens of the dwelling unit allocation only created in Ahrens the right to apply for a building permit and a plan check. ■■■ This procedure in the IDO is consistent with the language in *Avco, supra,* 17 Cal.3d at page 795: "[T]he general rule [is] that a builder must comply with the laws which are in effect at the time a building permit is issued, including the laws which were enacted after application for the permit. [Citations.]" Such laws may include zoning laws, and as the Supreme Court in *Avco* stated, "It is beyond question that a landowner has no vested right in existing or anticipated zoning. [Citations.]" (*Id.* at p. 796.) Predevelopment expenditures alone do not create such a right. (*Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 985-986 [137 Cal.Rptr. 699].) A government's right to control land-use policy cannot be impaired by the "freezing" of zoning law applicable to a particular development as of the time particular preliminary decisions are made concerning the project. (*Avco, supra,* 17 Cal.3d at p. 797.)

■■■ Moreover, we do not find the use in the IDO of the term "entitlement" in several specific contexts to be determinative of the vested rights issue. For example, section 6D, subdivision (2) of the IDO, setting forth the procedure for development approval during the interim period, states that in reviewing applications for dwelling unit allocations, the administrator shall take into account certain factors, including the existence of "[d]evelopment approvals granted prior to the effective date of this ordinance pursuant to a vesting tentative map, development agreement, or *other entitlement* which may create a legally vested right to development of the whole or part of the project under California law." (Italics added.) By this language, the city evidently sought to recognize and exempt from the operation of the IDO certain previously established vested rights, such as a vesting tentative map (Gov. Code, § 66498.1 et seq.), or a development agreement (Gov. Code, § 65864 et seq.), not to create a special exemption for rights actually established by the IDO itself. Instead, priority is established pursuant to the IDO for already existing vested rights.

Similarly, section 6J of the IDO states that an applicant who received a dwelling unit allocation had one year to apply for a building permit "to exercise the entitlement to the units represented by the allocation." This

reference to the "entitlement to the units represented by the allocation" falls short of a recognition of a vested right, since further procedures are expressly required by the IDO in the form of an application for building permit and plan check. Absent this compliance with the terms of the IDO, a dwelling unit allocation does not create an entitlement in the nature of a vested right. Section 6J of the IDO further recognizes that such an entitlement to apply for building permits may be waived, which shows that the right represented by the dwelling unit allocation is lesser in nature than a vested right to build pursuant to permits actually received. (*Santa Monica Pines, Ltd.* v. *Rent Control Board, supra,* 35 Cal.3d at p. 867.)

We are also unpersuaded by the reference in section 11 of the IDO[8] to "discretionary permits" that the dwelling unit allocation represents the final step in a discretionary approval process, culminating in the establishment of a vested right to proceed with the development project. Here, as in *Avco, supra,* 17 Cal.3d at pages 794-795, even though some preliminary approvals were granted to a developer, the applicable municipal code does not authorize construction without a building permit, a distinct requirement of the development approval process. (*Id.* at p. 795, fn. 5.)[9] This principle was applied in *Blue Chip Properties* v. *Permanent Rent Control Bd.* (1985) 170 Cal.App.3d 648, 661 [216 Cal.Rptr. 492], where the Court of Appeal relied on *Avco, supra,* 17 Cal.3d at page 795 for the proposition that "[t]entative tract map approval does *not* guarantee that a building permit, if required, will be issued, as the building permit has an independent reason for existence. [Citations.]" (*Blue Chip Properties* v. *Permanent Rent Control Bd., supra,* at p. 661, original italics.) Here, too, the dwelling unit allocation procedure created by the IDO evidently has a different reason for existence than does the actual application for a building permit, also required by the terms of the IDO.

Ahrens's argument that he had obtained all necessary discretionary approvals for his project (*Youngblood* v. *Board of Supervisors, supra,* 22 Cal.3d

---

[8]Section 11 of the IDO, entitled CODE COMPLIANCE, states: "All [IDO] variance applications, quarterly allocations, appeals of the Administrator decision and released projects are to receive a full zoning plan check by the Building Inspection Department. No [IDO] variance request, appeal or released project is to be brought forth for public hearing for potential allocation unless full zoning code compliance is present and any required discretionary permits approved and recorded."

[9]A similar "development allotment application" procedure (*Pacifica Corp.* v. *City of Camarillo, supra,* 149 Cal.App.3d 168, 176) was characterized as a land-use decision affecting the community at large as well as the individual applicant, made by the application of specific standards to existing facts. (*Id.* at p. 176.) In that case, the Court of Appeal noted that since developers were required to obtain a development allotment before a building permit could be issued, under that growth control law, a developer who had no development allocation had not yet acquired any vested rights in the planned development of its property. (*Id.* at p. 178.) The opinion does not suggest that a developer who did receive development allotments was entitled to a vested right either.

644; *City of West Hollywood* v. *Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1192 [278 Cal.Rptr. 375, 805 P.2d 329]) is therefore not well taken. In *Youngblood, supra,* at pages 655-656, subdivision map procedure required the governing body to make what amounted to a final approval of a project at the tentative map stage. In *West Hollywood, supra,* at page 1192, concerning condominium conversions, final map approval and issuance of a public report completed all state requirements, and the city was not allowed to impose its own newly enacted requirements after such final approvals had been obtained. This authority deals with entirely different regulatory schemes, with which those developers had completely complied.

Here, in contrast, the IDO expressly provides that further action, i.e., application for a building permit, is required even after the dwelling unit allocation is made. The scope of the right created by the IDO is to make further application. It makes no difference that building permit approval is normally considered a ministerial process where appropriate land use regulation compliance is present (*Elysian Heights Residents Assn., Inc.* v. *City of Los Angeles* (1986) 182 Cal.App.3d 21, 31 [227 Cal.Rptr. 226]), since the IDO by its terms required such an application to be timely made in order to exercise and perfect the entitlement to the dwelling unit allocation, under the current zoning of the property.

Moreover, even though city planner Jacobs's supplemental declaration stated his belief as of the summer of 1989 that the planning department retained no further discretionary approval authority over the project, the fact remains that Ahrens did not completely comply with the IDO procedures by applying for and obtaining building permits. Evidently, the trial court was not persuaded that no such compliance was required in accordance with Ahrens's claim he was told by "the planning department" he could not make such application unless all 26 units were preapproved; we are required to defer to this factual determination. (*Committee for Responsible Planning* v. *City of Indian Wells, supra,* 209 Cal.App.3d at pp. 1010-1011; *City and County of San Francisco* v. *Grant Co.* (1986) 181 Cal.App.3d 1085, 1091 [227 Cal.Rptr. 154].)

Even if the city's letters to Ahrens concerning the IDO allocations created a good faith subjective belief on his part that he had a vested right to proceed with the particular development plans, such a belief is not enough to create a vested right which is otherwise unsupported by the land use regulations and facts of the particular situation. (*Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839, 853 [244 Cal.Rptr. 682, 750 P.2d 324].)

Moreover, " '[a]n equitable estoppel requiring the government to exempt a land use from a subsequently imposed regulation must include (1)

a promise *such as that implied by a building permit* that the proposed use will not be prohibited by a class of restrictions that includes the regulation in question and (2) reasonable reliance on the promise by the promisee to the promisee's detriment. *[Ibid.]'* [Citation.]" (*Russ Bldg. Partnership* v. *City and and County of San Francisco, supra,* 44 Cal.3d at p. 854, italics added.)

Here, we do not find the "promise" made by the IDO allocation rose to the level of one "such as that implied by a building permit" (*ibid.*) to create a vested right to proceed with a development without further compliance with other land use planning restrictions. As in *Russ Bldg. Partnership,* the government's "promise" was limited by the requirement in the IDO that a building permit application and request for plan check be made. The city was not estopped from conducting the rezoning procedures concerning this property even after the IDO allocation was made, in light of Ahrens's failure to fully comply with the IDO procedure in order to vest before the rezoning was completed.[10]

As suggested above, we disagree with Ahrens's argument that the nature of the IDO application he submitted, specifically identifying the type of project in contemplation, including its elevations and site plans, was adequate to create a vested right because it placed the city on some degree of notice of the type of structure sought to be developed. (See *Avco, supra,* 17 Cal.3d at p. 794.) Instead, we find the type of specificity required in the IDO application represents an effort by the city to create a rational and fair means of distributing a limited resource, i.e., the dwelling unit allocations under the IDO. Because the IDO imposed a cap of 8,000 units per year for all the various neighborhoods of the city, and included a designation of the number of units per neighborhood that were to be allocated, the city also properly included in the IDO an attempt to create a rational and fair mechanism for

[10]At the hearing before the trial court, the city made a general request for judicial notice of the city charter, the municipal code, all city ordinances and resolutions, and planning commission resolutions, as well as decisional law and public records provided with the points and authorities on file. At the hearing, the trial court agreed to take judicial notice of particular city ordinances, San Diego Municipal Code section 62.0401 et seq., the land development permit provisions concerning grading approvals. At oral argument before the trial court, and on rehearing application before this court (supported by a request for judicial notice), the city has argued that the land development ordinance and CEQA requirements (Cal. Environmental Quality Act, Pub. Resources Code, § 21000 et seq.) create additional discretionary approvals which were required before Ahrens could exercise his right to the IDO dwelling unit allocations made. Although we, like the trial court, have taken judicial notice of the land development ordinance (denying the balance of the city's request; Evid. Code, § 459, subd. (a)), we need not base our decision on this argument. The structure of the IDO itself and the language of the letters sent to Ahrens by the city clearly provide that compliance with the IDO process was not the only compliance with city planning procedures (such as the building permit process) that was required under the city's code. (IDO, § 9A, providing that the IDO is supplementary to existing planning procedures; also see *City of West Hollywood* v. *Beverly Towers, Inc., supra,* 52 Cal.3d at p. 1192.)

allocating the various permits to appropriate recipients. Objective criteria set up by the IDO administrator, such as the provision of site plans, elevations, and other details about the proposed structure, were necessary so that a fair allocation could be made. Such specificity, however, did not serve to create a vested right in a recipient of a dwelling unit allocation to proceed with a particular project, without compliance with the other requirements of the IDO and the city municipal code, such as the acquisition of a building permit and plan check.

The city's efforts to make the IDO a fair and objective procedure may not result in the imposition of vested rights upon compliance with such an interim procedure.

As Ahrens correctly notes, land use planning law has evolved greatly since *Avco* was decided in 1976. However, the vested rights doctrine enunciated by *Avco* has stood the test of time, and may properly be applied even to modern land use planning devices such as a dwelling unit allocation procedure like the IDO.

### III

### *Abuse of Discretion Claim*

Having concluded that the IDO dwelling unit allocation did not create a vested right in Ahrens to proceed with his development, it remains for us to address his related claim that the rezoning of the property to single-family residential use was invalid under the theory that it was an arbitrary and capricious spot-zoning procedure. (*Viso* v. *State of California* (1979) 92 Cal.App.3d 15, 22 [154 Cal.Rptr. 580].) ■ Zoning may be judicially invalidated if it is arbitrary and unreasonable, if it bears no reasonable relationship to the regional welfare, or if it deprives the landowner of substantially all use of the land. (*Arnel Development Co.* v. *City of Costa Mesa, supra*, 28 Cal.3d at p. 521.)

■ "One permissible basis for an attack upon the validity of a zoning ordinance is that the zoning ordinance is 'spot zoning.' [Citation.] Spot zoning occurs where a small parcel is restricted and given lesser rights than the surrounding property, as where a lot in the center of a business or commercial district is limited to uses for residential purposes thereby creating an 'island' in the middle of a larger area devoted to other uses. [Citation.] Usually spot zoning involves a small parcel of land, the larger the property the more difficult it is to sustain an allegation of spot zoning. [Citations.] Likewise, where the 'spot' is not an island but is connected on some sides to

a like zone the allegation of spot zoning is more difficult to establish since lines must be drawn at some point. [Citation.] Even where a small island is created in the midst of less restrictive zoning, the zoning may be upheld where rational reason in the public benefit exists for such a classification. [Citations.]" (*Viso* v. *State of California, supra,* 92 Cal.App.3d at p. 22.)

█ In making his claim that his property was "spot zoned," Ahrens contends that the city failed to adequately weigh the competing interests of himself as landowner and the neighboring landowners. (*Raley* v. *California Tahoe Regional Planning Agency, supra,* 68 Cal.App.3d at pp. 975-976.) The trial court disagreed, denying Ahrens's petition for writ of mandate to compel the city council to vacate the rezoning decision and permit Ahrens the opportunity to pursue his development plan. In so doing, the trial court made factual findings concerning the extent to which the city council weighed the competing interests, and whether its conduct constituted an abuse of discretion. (*City of Carmel-by-the-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d at pp. 238-239.) The record contains declarations on personal knowledge by Ahrens and by city planners Jacobs and Levin concerning the topographical and usage characteristics of the land and the surrounding area. As succinctly noted by the court in *Viso* v. *State of California, supra,* 92 Cal.App.3d at page 22, lines in zoning must be drawn at some point. The trial court evaluated the evidence and we will not disturb its evaluation on these factual issues concerning the existence of a valid basis for the city's action.[11]

## DISPOSITION

The order is affirmed.

Froehlich, J., concurred.

**NARES, J.**—I respectfully dissent. I disagree with the majority as to the facts of this matter, the applicable standard of review, and the controlling precedent as set forth by our Supreme Court in various cases. I would, for the reasons set forth below, reverse.

Appellants Robert and Eva Consaul and Thomas Ahrens (collectively, Ahrens) own a 1.06-acre of undeveloped land in a highly urbanized area of

[11]Because the petition for writ of mandate pleads no separate cause of action for inverse condemnation, and does not adequately present the issue to the trial court of whether any viable economic use of the property was denied by the rezoning decision here (see *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25], affd. (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138]; *Nollan* v. *Cal. Coastal Commission* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141]), we do not find it necessary to address the arguments presented on appeal concerning the "taking" issues. (*Twain Harte Associates, Ltd.* v. *County of Tuolumne* (1990) 217 Cal.App.3d 71, 81 [265 Cal.Rptr. 737].)

San Diego (City). Ahrens petitioned the superior court for a writ of mandate after their land was downzoned from multifamily residential (R-1000) to single-family dwelling (R1-5000). The superior court denied the petition without stating what standard of review it used. Ahrens timely appealed.

The primary issue presented is whether Ahrens acquired a vested right to develop the property by spending 22 months and $60,000 obtaining all discretionary approvals for their project, including allocations of permits in compliance with City's Interim Development Ordinance (IDO). The administrative record undisputedly supports Ahrens's contention they had received all discretionary approvals, but City urges us to limit the vested rights doctrine to cases where the owner had obtained vested tentative subdivision maps, development agreements or building permits.

I would reject City's suggested limitations. In my view, Ahrens acquired a vested right to develop their property when they received their final allocations under the IDO. (*City of West Hollywood* v. *Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1190 [278 Cal.Rptr. 375, 805 P.2d 329].) City's subsequent action in downzoning the property affected this vested right. Thus, the trial court was required to apply its independent judgment to the evidence presented to it, including the relevant administrative record. Because the record does not reflect the trial court applied its independent judgment, I would reverse.[1]

FACTS

In 1976, Robert and Eva Consaul purchased a 1.5-acre parcel in a highly urbanized area of City. At that time, the property was developed with a single-family residence and two apartments. These structures remain and are located at the top of a hill at the end of a cul-de-sac. Thomas Ahrens has lived in one of the apartments since 1976, acting as the apartment manager for the Consauls. Until the challenged action, the property has been zoned R-1000, permitting development of up to 65 units.

In 1986, Ahrens and the Consauls entered into an agreement to develop the property, with Ahrens purchasing an interest in the land. By this time, most of the surrounding area had been developed. The parties dispute whether the surrounding development is multifamily or single-family, but there is a 250-unit apartment building within 500 feet of the property and very high density to the north, south and west. Directly east is a steep canyon. At the base of the property, there is an area of single-family homes

---

[1]In light of my conclusion on the vested rights issue, I would not reach Ahrens's remaining contentions.

which is topographically separated from the multifamily units circumscribing it on all sides. (See exhibit A.) These single-family homes are constructed with 1 home every 3,000 to 5,000 square feet—a density of 8.7 to 14.5 dwellings to the acre. There is no access to Ahrens's property from this single-family residential area, and none to any of the other high density multifamily areas located on the ridges above both sides of the single-family homes.

Ahrens retained engineers and surveyors in 1986, and processed a map (in compliance with the Subdivision Map Act) to split the parcel in two. Parcel 1 is at the top of the hill, and contains the existing structures. It remains zoned multifamily (R-1000) and is not involved in this action. Parcel 2 is 1.06 acres, L-shaped, and under the R-1000 designation could have been developed with 54 units. However, there are additional constraints on the development of the site relating to slopes, hillsides, and grading which decrease the total number of units which can be constructed to 44. When the map was processed, City required that access be taken from the top of the hill through the developed high density multifamily area adjacent to parcel 1. This access road serves only this one parcel and will cost in excess of $134,000 to construct. It took City six months to process the map which was recorded in February 1987. Ahrens spent $7,200 processing the map, as well as hundreds of hours to prepare it and meet with City. After the map was recorded, Ahrens began plans for developing the property by hiring an architect, a project planner and a civil engineer. Ahrens's initial plans were for development of 44 units, consistent with both the adopted land use and existing zoning.

On July 14, 1987, City adopted an amended, revised, comprehensive and very detailed community plan (the Plan) for the area "designed to guide development [ ] for the next fifteen to twenty years." The Plan's stated objective is to promote multifamily infill and to accommodate increased development without significant impact to adjacent land uses or traffic. The subject property is designated on the Plan (which supersedes the Coastal Plan of 1981)) as multifamily. The Plan notes this area of the City has maintained a stable population since 1965, with 70 percent of the area zoned for single-family use and 15 percent zoned for multifamily use. The Plan recognizes this is a highly urbanized community. The Plan was prepared with the assistance of local residents acting as a planning group, who made recommendations to City for changes in both land uses and zoning in this area. Ahrens's parcel was not one suggested for any changes.

One week after City adopted the Plan (on July 21, 1987), the city council adopted an IDO for the entire City, placing a limitation of 8,000 units, i.e., building permits, allowed to be issued citywide regardless of local plans or

zoning. The initial period of the IDO was to be 18 months. Each area was then allocated a "fair share" of these 8,000 annual permits; the subject area (the Peninsula Community) was allocated 96 units per year. Applicants for these permits had to complete stringent requirements for discretionary review, and units were allocated quarterly only.

There have been two amendments to the IDO, including one in 1988. Each of the three IDO ordinances contains detailed procedures, as well as standards and criteria which must be considered in reviewing applications for IDO allocations.

In urbanized areas, the first priority is to be given to "development approvals" granted before the effective date of the ordinance. These "development approvals" include "vesting tentative map, development agreement, *or other entitlement* which may create a legally vested right to development of the whole or part of the project under California law." (Italics added.) Even if a developer possessed building permits when the IDO was adopted, no residential development could proceed under those permits unless it met the IDO provisions including the community allocation.

Ahrens learned of the IDO and immediately met with City, who informed them they could not apply for any building permits until they received their IDO allocation. Ahrens complied with the IDO by submitting detailed site plans, grading plans, elevations and locations of all improvements such as buildings, units within the buildings, parking, landscaping and access road. Meetings with City resulted in the development being decreased from 44 to 26 units. When final plans were submitted, City directed Ahrens meet with the local planning group for its input. Ahrens did so, presenting the 26-unit project for the 1.06 acres. The planning group issued no objection to the project, and the plans were returned to City for final processing of the IDO allocation application.

Finally, on November 4, 1988, Ahrens were granted 18 of the 26 unit allocations. They were told they could not process any building permits until they received the final eight-unit allocation, which might be possible during the next quarterly period. On March 2, 1989, Ahrens received the final eight-unit allocation and prepared to obtain financing for their project. The IDO states an applicant who receives a dwelling unit allocation shall have one year to submit to the building inspection department a building permit application form to exercise "the *entitlement* to the units represented by the allocation." (Italics added.) This one-year period was also set forth in the November letter to Ahrens.

On April 27, the newly elected chair of the local planning group wrote a letter to City under the subject heading: "Protected Single-Family Neighborhood Maps." In this letter, the chair states the group voted to suggest Ahrens's property be investigated for single-family residential zoning. City conceded the interim single-family protection ordinance (INSFPO) adopted by the city council as an urgency on August 9, 1988, does not and never has applied to Ahrens's property.[2] Nevertheless, during this period of evaluation the local planning group reviewed, voted on and recommended a zoning change on Ahrens's property. Ahrens were never notified of the group's action and never had the opportunity to present their plans to this newly constituted group.

Notwithstanding the inapplicability of the INSFPO to Ahrens's property, the San Diego City Planning Commission conducted a noticed public hearing on an item listed as: "Classification of Single-Family Neighborhoods and Related Rezonings and Plan Amendments in Peninsula." This notice, dated June 30, 1989, for a hearing on July 13, 1989, was the first time Ahrens were informed of any proposed action on their property. City's report notes Ahrens's parcel as vacant, but does not mention the IDO allocations. Ahrens appeared and opposed the rezoning. The planning commission voted, six to zero, to recommend adoption of the item before it—the classification of single-family neighborhoods and related rezonings and amendments to the community plan.[3]

Thereafter, the city council noticed a public hearing for August 8, 1989. The agenda item is the same as the planning commission's and includes the subject property rezone. The matter was continued until September 11 to allow Ahrens to present their project to the new planning group. The planning group met on August 17. Ahrens presented their project after counsel asked the board if it had already voted on the rezoning. The response was the group had already voted, despite one member's admission he had never been advised Ahrens had plans for the vacant parcel, nor had he been advised what stage these plans were in when the group voted to recommend downzoning. According to the chair who had requested Ahrens's vacant parcel be rezoned, despite the fact the vacant parcel is not subject to the INSFPO, the only purpose for allowing Ahrens to present their project was to comply with the city council's request. Thus, the group allowed Ahrens to make their presentation but took no action.

[2] City's concession is never explained in light of the action it took under the provisions of the inapplicable INSFPO.

[3] Ahrens, in a supplemental declaration, stated they sought to apply for building permits after receiving notice of the intended rezoning but were informed none would be processed. No competent, admissible evidence was presented which refuted Ahrens's declaration.

Accordingly, as City notes, "In effect, this left intact the Board's earlier vote recommending a downzoning of the property."[4] At its continued hearing on the classification of single-family neighborhoods, the city council voted unanimously to (1) adopt a resolution approving the protected single-family neighborhood maps and releasing those areas not mapped for classification; and (2) adopt a resolution approving "related amendments to the Community Plan as well as the rezoning of the Ahrens' property" from R-1000 to R1-5000.

On December 26, Ahrens filed a petition for writ of mandate in the superior court. They contended the rezoning was invalid on four separate grounds: (a) they had obtained a vested right to develop their property under the theory of promissory estoppel; (b) the rezoning violated City's promise under the IDO allocation to allow them one year to develop their twenty-six units, and City was estopped from denying them such right; (c) the rezoning constituted an arbitrary and capricious act of "spot-zoning"; and (d) it constituted a taking of their property without just compensation because it rendered their property economically valueless. Additionally, Ahrens alleged the INSFPO did not apply to their vacant parcel, attaching the relevant IDO and INSFPO as adopted and subsequently amended.

City answered the petition and filed a demurrer on the ground that it was not timely filed.[5] Ahrens replied. City filed additional and supplemental documents after Ahrens's reply, including a separate single sheet document entitled, "Request For Judicial Notice."[6] The superior court heard the matter on its law and motion calendar on February 26, 1990, and took it under submission. By minute order dated March 7, 1990, the court ruled, "Plaintiff's Petition For Writ Of Mandate Is Denied And The Demurrer Is Overruled." The court made no findings or other rulings, although it stated it would take the matter under submission after Ahrens agreed with its statement that it should "tell me to go back and reread this stuff with a different eye or a different standard, perhaps." Ahrens timely appealed.

### DISCUSSION

### I. *Judicial Notice and Related Preliminary Matters*

The foundation for my review of the merits of this petition begins with a single sheet of paper in this 768-page record. City requested the trial court

---

[4]City urges this court to carefully consider the comments of a representative of those persons supporting the rezone. I have done so, even though the comments are not material or relevant to the official action taken by City.

[5]The ruling on the demurrer is not part of this appeal.

[6]Although not file stamped, I assume for purposes of discussion that the request was, in fact, filed with the superior court.

take judicial notice pursuant to Evidence Code sections 451, 452, and 453 of "the City of San Diego's Ordinances and Resolutions, the City of San Diego's Planning Commission Resolutions and all decisional law of other jurisdictions and other public records provided with the Respondent's Points and Authorities filed in this matter." Now, without citation to any authority, City requests this court "to take such notice."

I assume City is requesting that the court take judicial notice under Evidence Code section 459. However, this section requires this court to "take judicial notice of (1) each matter properly noticed by the trial court and (2) each matter that the trial court was required to notice under Section 451 or 453." The record does not reflect what documents the trial court judicially noticed. The only ruling on any request for judicial notice by City was when the City Attorney discussed hearsay statements regarding two potential discretionary approvals which might remain for this project. When the court noted these hearsay statements were unsupported anywhere in the 597 papers filed with the court, City requested the court "to judicially notice 62.0401 et. seq. today." The court responded, "I can do that."

If the court had ruled on City's request for judicial notice, it would have eliminated most of the record before it, allowing it to focus its attention on the merits of Ahrens's petition based on the admissible relevant evidence before it. First, City's admission that the INSFPO never applied to Ahrens's parcel would have eliminated this portion of the record. Instead, however, the city attorney orally argued the INSFPO *supported* the rezoning. It attempted initially to do so before this court as well. Because the INSFPO did not apply to Ahrens's property, this argument is plainly unpersuasive.[7]

Second, City cited the superior court no authority, and I have found none, for judicially noticing (1) planning department reports relating to a draft ordinance which was never adopted, (2) a draft ordinance which was never adopted, (3) a planning department classification and methodology attached to the draft ordinance which was never adopted, and (4) an IDO information booklet prepared by staff.

This court denied City's request to judicially notice ordinances which were not before us and records which do not reflect official action. Instead, the focus and crux of this case is the IDO and its provisions as adopted by City.

Finally, for purposes of my decision, I would disregard City's references throughout its brief to comments made by the City Attorney to the superior

---

[7]It does, however, raise questions regarding the validity of the ordinance purportedly rezoning Ahrens's property "Into R1-5000 Zone . . . In Order To Implement The Single-Family Protection Ordinance."

court regarding "considerable doubt that the Appellants have obtained the final discretionary approval necessary for their project." The supplemental declaration of city planner Christopher Jacobs, filed after Ahrens replied to City's opposition, states, "I do recall receiving telephone calls in spring or early summer 1989 from at least one property owner and from other concerned citizens about the Curtis Street property [City's designation for Ahrens's property] as to whether the Planning Department retained any discretionary approval authority over the proposed 26-unit condominium project on the R-1000 zoned property. This answer to this question was no."

The undisputed admissible and competent evidence before us is that Ahrens had obtained all discretionary approvals for their 26-unit condominium project at the time City took its action to rezone their property. (See exhibit B.) I now turn to the merits of Ahrens's petition.

## II. *Standard of Review*

Ahrens complied with section 101.0210 of City's code which requires a party challenging a zoning or rezoning decision by City to file a petition for a writ of mandate under section 1085 of the California Code of Civil Procedure.[8] This same section indicates a petition for writ of mandate under section 1094.5 must be filed to attack the grant or denial of a variance, or any administrative decision or permit. By directing the petitioners to section 1085 and then section 1094.5, City's code is misleading.

A petition for writ of mandate under section 1085 (ordinary or traditional mandamus) is the proper format for challenging a legislative action, whereas section 1094.5 (administrative mandamus) is used when the action being attacked is adjudicatory. "A legislative or quasi-legislative action is the formulation, without regard to a specific set of facts, of a general rule applicable to future situations. An adjudicatory action is the determination of specific rights in regard to a specific fact situation." (Cal. Administrative Mandamus (Cont.Ed.Bar 1989) § 1.7, p. 7, citing *Wulzen* v. *Board of Supervisors* (1894) 101 Cal. 15, 24 [35 P. 353].) Legislative actions create broad, general rules of public policy; adjudicatory actions affect specific individuals. Whether an action is legislative, adjudicatory or a combination of both must be determined by the facts of each individual case. (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 613 [156 Cal.Rptr. 718, 596 P.2d 1134].)

Although I agree with City that Ahrens should have set forth the nature of the writ being sought as well as the applicable standard of review before the superior court, I disagree Ahrens should be penalized for this failure by

---

[8]All statutory references are to the Code of Civil Procedure unless otherwise specified.

denying them appellate review on the merits. We have been cited no California case, and my independent research has found none, which addresses the specific factual question raised in this case. There is one common thread in all of our Supreme Court cases on land use: whether a challenged action falls under section 1085 or section 1094.5, and the applicable standard of review must be determined on a case by case basis and depends on the facts and the nature of the right being affected by the challenged action. Where a vested right is impinged by an adjudicatory or quasi-adjudicatory action, the reviewing court applies its independent judgment in analyzing the correctness of the superior court's decision. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242]; *Horn* v. *County of Ventura, supra,* 24 Cal.3d 605; *County of Alameda* v. *Board of Retirement* (1988) 46 Cal.3d 902 [251 Cal.Rptr. 267, 760 P.2d 464]; *McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348 [261 Cal.Rptr. 318, 777 P.2d 91]; *301 Ocean Ave. Corp.* v. *Santa Monica Rent Control Bd.* (1991) 228 Cal.App.3d 1548, 1556 [279 Cal.Rptr. 636].)

Here, in contrast to the typical rezoning which is often characterized as "legislative" because it serves broad, general public policy[9], Ahrens's parcel was not included with revisions of the local plan and related rezonings in 1987. City then enacted another layer of regulation—the IDO.

The IDO established a process with stringent requirements. Before permits can be allocated under the IDO, "the Administrator"—actually the city manager, city planning director and the city engineer—must all sign the letter allocating permits, affirming they have approved the development plans forming the basis for the application. Additionally, the IDO required Ahrens to present their scaled-down detailed plans to the local community planning group for its input before "the Administrator" would take final action on the IDO application.

Development allotment permit programs, such as this IDO, are not new to this state, and the process involved in such allotments has uniformly been held to be *adjudicatory*. (*Pacifica Corp.* v. *City of Camarillo* (1983) 149 Cal.App.3d 168 [196 Cal.Rptr. 670].)

Although Ahrens labelled their petition for writ of mandate as one under section 1085, they were challenging a rezoning after having received their 26-unit allocations and were given 1 year "to submit to the Building Inspection Department a building permit application form to exercise the *entitlement* to the units represented by the allocation." (Italics added.) More importantly, regardless of its caption, the petition clearly alleged Ahrens had

---

[9](Such as overall amendments to general or local plans followed by related rezonings.)

a *vested right* to develop their property in compliance with the approved plans and the IDO allocation. Thus, I conclude the applicable standard of review of Ahrens's petition is the independent judgment test, and I would reject City's request to review this record simply for abuse of discretion.

### III.   *The Vested Rights Doctrine*

The vested rights doctrine is based on the theory of equitable estoppel. It requires two elements be present before it applies. First, there must be a promise; second, the promisee must show reasonable detrimental reliance on that promise. Citing, among others, *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546],[10] Ahrens contend "that something other than a building permit may amount to sufficient government action to form the basis through which vesting may occur."

City disagrees, arguing as it did before the superior court that equitable estoppel in land use cases "requires a promise implied by a *building permit.*" (Italics in original.) In support of this argument, City relies on *Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839 [244 Cal.Rptr. 682, 750 P.2d 324]. It is this argument and this case which the trial court found persuasive when it rejected Ahrens's claim to a vested right.

However, in my view, *Russ* is neither dispositive, much less apposite, here. The question in *Russ* was the interpretation of a traffic mitigation condition contained in building permits which had already been obtained by the developers and under which construction was in progress. *Russ* does not hold, as City contends, that the possession of building permits is the *sole* criteria for applying the vested rights doctrine.

Indeed, the vested rights doctrine is *not* limited to the possession of building permits. In *Youngblood* v. *Board of Supervisors, supra,* 22 Cal.3d 644, our Supreme Court held a developer which had received approval of a tentative map, in compliance with the then-existing land-use plan for the area, could not be denied the right to develop consistent with that approved tentative map, despite a change in the land-use plan prior to the approval of a final subdivision map. The dispositive question was whether the developer had obtained all necessary discretionary approvals, making the issuance of the final subdivision map a ministerial function.

---

[10]*Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556], *Pardee Construction Co.* v. *California Coastal Com.* (1979) 95 Cal.App.3d 471 [157 Cal.Rptr. 184], and *Elysian Heights Residents Assn., Inc.* v. *City of Los Angeles* (1986) 182 Cal.App.3d 21 [227 Cal.Rptr. 226].

Recently the Supreme Court summarized the vested rights doctrine as one of "fairness," specifically citing *Youngblood.* Again, the Supreme Court focused on whether the developer has all the requisite discretionary approvals in order to proceed free of subsequent regulation. (*City of West Hollywood v. Beverly Towers, Inc., supra,* 52 Cal.3d at p. 1190.)

City obfuscates the effect of the IDO allocation, arguing its power to zone or rezone land and to regulate density of development remained unchanged by the IDO and remained in full force and effect. Although adopting the IDO did not affect City's power, allocating the permits under the IDO did. The IDO exempted from its provisions, "Development approvals granted prior to the effective date of this ordinance pursuant to a vesting tentative map, development agreement, *or other entitlement* which may create a legally vested right to development of the whole or part of the project under California law." (Italics added.) Further, no project could be granted an allocation "unless full zoning code compliance is present and any required discretionary permits approved." I have already noted paragraph J of the IDO refers to the units represented by the allocation as "the entitlement." Finally, when City adopted the urgency INSFPO, it exempted from its provisions "any lot or premises with a valid [IDO] allocation granted prior to August 9, 1988." These references to the units as an entitlement and the treatment afforded a valid IDO, even in an ordinance adopted as urgency legislation, hardly comport with City's contention the IDO allocation "was an invitation to submit a building permit application and plan check with the Building Inspection Department."

I conclude, therefore, the allocation was in fact an entitlement, a vested right to proceed with the project in compliance with the discretionary approvals received by Ahrens and upon which they reasonably relied to their detriment.[11] Therefore, the trial court erred in failing to apply its independent judgment to the evidence presented to it, including the entire administrative record.

Where, as here, the only admissible, competent evidence is undisputed that a party has acquired all discretionary approvals and the issuance of building permits remained as a ministerial act, the ultimate conclusion to be drawn from such facts is a question of law. Thus, the conclusion of the trial court is not controlling on appellate review. (*Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 74-75 [227

---

[11]At no time did City come forth with any competent relevant evidence that any discretionary permits remained before Ahrens could obtain building permits.

Cal.Rptr. 667, 720 P.2d 15].) Because Ahrens's writ challenged an adjudicatory action of City which involved a vested right, I would reverse and remand with directions to the superior court to grant their petition.[12]

Respondent's petition for review by the Supreme Court was denied August 20, 1992.

---

[12]Following publication of our opinion in this case, this court granted City's petition for rehearing to consider City's arguments that the court's opinion: (1) mistakenly concluded the City inappropriately used the INSFPO to rezone the property; (2) incorrectly described the property and its surroundings; (3) improperly concluded no more discretionary permits remained to be obtained for the project; (4) applied an incorrect standard of review; (5) did not clearly set out directions on remand; or (6) in the alternative, if this court did not desire to correct "several analytical and factual errors," we should depublish the opinion which "would negate any necessity to modify the Opinion."

**1814**

EXHIBIT A

EXHIBIT B

INTERIM DEVELOPMENT ORDINANCE

ALLOCATION PROCESS

MAY 19, 1988

BUILDING PERMIT SUBMITTAL

CITY COUNCIL DENIAL

CITY COUNCIL APPROVAL

CITY COUNCIL NOTICED HEARING

ACCELERATED VARIANCE REQUEST (3 UNITS OR LESS)

COMMUNITY PLANNING GROUP RECOMMENDATION

NON-ACCELERATED VARIANCE REQUEST (4 UNITS OR MORE)

APPEAL OF ADMINISTRATOR'S DECISION

ALLOCATION NOT GRANTED

ADMINISTRATOR'S QUARTERLY ALLOCATION

ALLOCATION GRANTED

DISCRETIONARY PERMIT APPROVAL IF REQUIRED

ZONE CONFORMANCE CHECK & ENVIRONMENTAL REVIEW

ZONE CONFORMANCE CHECK

RELEASED PROJECTS & RELEASED COMMUNITIES

QUARTERLY APPLICATION SUBMITTAL

EXEMPTIONS

000272